J-S26043-16

2016 PA Super 158

IN RE: ALBERT STAICO, JR.      :     IN THE SUPERIOR COURT OF
                            :          PENNSYLVANIA
                            :
APPEAL OF: DOROTHY STAICO    :     No. 2627 EDA 2015

Appeal from the Decree July 15, 2015
in the Court of Common Pleas of Philadelphia County
Orphans' Court at No(s): Control No. 125387
No. 798AP of 2012

BEFORE: OLSON, STABILE, and STRASSBURGER,* JJ.

OPINION BY STRASSBURGER, J.:         **FILED JULY 20, 2016**

Dorothy Staico (Dorothy) appeals from the decree entered by the orphans' court with respect to the estate of her son, Albert Staico, Jr.[1] Upon review, we affirm.

The orphans' court summarized the facts underlying this case.

> Albert Staico, Jr., ([Decedent]) died on June 12, 2011, a resident of Philadelphia. He was unmarried and survived by his Mother, [Dorothy], and his sister, Janice Martin. A document dated June 7, 2011, was admitted to probate by the Register of Wills on July 7, 2011, as [Decedent's] last will and testament.
>
> In April of 2008, [Decedent] moved from [Dorothy's] house to that of his long-time girlfriend[, Emma Martin,] and her brother[, Lawrence.] [Decedent] lived with [Emma] and her brother until his death three years later. Also in 2008, [Decedent] designated [Emma] as the beneficiary of his Fidelity IRA, and in 2011 he designated her [as] the beneficiary of his pension.
>
> [Emma] testified at trial that [Decedent] asked [Emma] to contact an attorney to draft his will in May of 2011[.] [Emma] testified that she contacted attorney Frank Pasquini, and visited

---

[1] Dorothy is 87 years old. Her daughter, also Decedent's sister, Janice Martin, has power of attorney for Dorothy.

* Retired Senior Judge assigned to the Superior Court

his office to discuss [Decedent's] situation and convey his wishes. At this meeting, [Emma] informed [A]ttorney Pasquini that [Decedent] wished to leave his entire estate to her, and that [Decedent] could not attend the meeting because he was hospitalized. Attorney Pasquini prepared [Decedent's] will accordingly, and visited [Decedent] at Thomas Jefferson University Hospital on June 7, 2011, for its review and execution. It was [A]ttorney Pasquini's testimony that, after [Decedent] recognized him upon his entry, he discussed the will with [Decedent] and satisfied himself that [Decedent] was aware of the nature of the document and purpose for the meeting, and could clearly express his wish that [Emma] be left his entire estate. [Emma] was present and assisted [Decedent] in signing the will, but did not take part in the discussion between [Decedent] and [A]ttorney Pasquini. Attorney Pasquini signed the will as the first witness. He then returned to his office and located a second witness, James Quinn, who also signed the will and stated by way of affidavit that [Decedent] had signed the will the same day in [A]ttorney Pasquini's presence. Alexandra Torrie, [A]ttorney Pasquini's secretary, then notarized the will.

[Decedent] died the following week, and the Register of Wills admitted his will to probate on July 7, 2011, and granted [Emma] letters testamentary.

On June 1, 2012, [Dorothy] filed an appeal of the decision of the Register of Wills to admit the document dated June 7, 2011 to probate. Following discovery, witness and document exchanges, Dorothy filed a motion for summary judgment on November 14, 2014, which [the orphans' court] dismissed by decree of November 18, 2014, because it lacked any indication of service and because it was filed on the eve of trial. [The orphans' court] held an evidentiary hearing on November 25, 2014, at which [Dorothy] proceeded *pro se*, and at the request of Dorothy and with consent of opposing counsel, Dorothy's son[-]in[-]law, Paul Martin, who is not an attorney, participated on her behalf. At the hearing, [Emma], the will's proponent offered the Register of Wills file as evidence, and it was admitted without objection as proof of the will.

Subsequent to this hearing, and after careful consideration of the credibility of witnesses and the post-trial proposed findings of fact and conclusions of law, [the orphans' court] issued a decree on July 15, 2015, finding that [Dorothy] failed to

meet her burden of proving that [Decedent] lacked testamentary capacity, and failed to meet her burden proving that [Emma] exercised undue influence of [Decedent] when the will was executed, and so affirmed the decision of the Register of Wills. [Dorothy] filed a motion for reconsideration on August 11, 2015, and the following day, filed a notice of appeal of [the orphans' court's decree] of July 15, 2015. [The orphans' court] issued a decree declining to consider the motion for reconsideration for lack of jurisdiction due to the pendency of the appeal, and did not issue an order requesting a statement of errors complained of on appeal under Pa.R.A.P. 1925(b). [The orphans' court issued an opinion on October 30, 2015.]

Orphans' Court Opinion, 10/30/2015, at 1-4 (footnotes and unnecessary capitalization omitted).

On appeal, Dorothy sets forth two issues for our review.

A. Whether the [orphans'] court abused its discretion in confirming the Decedent's last will and testament since the document lacked the necessary criteria under the statute?

B. Whether the [orphans'] court abused its discretion in finding that [Dorothy] failed to meet her burden of proof by clear and convincing evidence that the Decedent lacked testamentary capacity in executing the will and was subject to undue influence.

Dorothy's Brief at 6 (suggested answers omitted).

We set forth our well settled standard of review.

When an appellant challenges a decree entered by the [o]rphans' [c]ourt, our standard of review "requires that we be deferential to the findings of the [o]rphans' [c]ourt." ***In re Estate of Miller***, 18 A.3d 1163, 1169 (Pa. Super. 2011) (*en banc*).

[We] must determine whether the record is free from legal error and the court's factual findings are supported by the evidence. Because the [o]rphans' [c]ourt sits as the fact-finder, it determines the credibility of the witnesses and, on

- 3 -

review, we will not reverse its credibility determinations absent an abuse of that discretion. However, we are not constrained to give the same deference to any resulting legal conclusions. Where the rules of law on which the court relied are palpably wrong or clearly inapplicable, we will reverse the court's decree.

*Id*. (alterations and citation omitted).

*In re Estate of Wilner*, 92 A.3d 1201, 1206 (Pa. Super. 2014) quoting (*In re Estate of Brown*, 30 A.3d 1200, 1206 (Pa. Super. 2011)).

Dorothy's first issue relates to the validity of the will itself. Specifically, she argues that the will was defective pursuant to 20 Pa.C.S. § 2502, which governs the execution of a will, and provides the following in relevant part.

Every will shall be in writing and shall be signed by the testator at the end thereof, subject to the following rules and exceptions:

\*\*\*

(2) Signature by mark.--If the testator is unable to sign his name for any reason, a will to which he makes his mark and to which his name is subscribed before or after he makes his mark shall be as valid as though he had signed his name thereto: Provided, That he makes his mark in the presence of two witnesses who sign their names to the will in his presence.

(3) Signature by another. If the testator is unable to sign his name or to make his mark for any reason, a will to which his name is subscribed in his presence and by his express direction shall be as valid as though he had signed his name thereto: Provided, That he declares the instrument to be his will in the presence of two witnesses who sign their names to it in his presence.

20 Pa.C.S. § 2502.

Specifically, Dorothy argues that the will is not valid because it was not signed by Decedent without assistance. Thus, Dorothy suggests that the sections governing signature by mark or signature by another should apply. She goes on to argue that if either of these two sections applies in this case, the will is invalid because the only witness who signed the will in Decedent's presence was Attorney Pasquini. Dorothy's Brief at 14-22.

> In **Vandruff v. Rinehart**, 29 Pa. 232, [234 (1857),] the Supreme Court held…:
>
>> 'If one having testamentary capacity, is unable from palsy or other cause to steady his hand so as to make to his will the signature required by law, another person may hold his hand and aid him in so doing; and it is not necessary to prove any express request from the testator for such assistance. The act is his own with the assistance of another, and not the act of another under authority from him. This principle is the only one questioned here. It was rightly decided.[']

**In re Milleman's Estate**, 203 A.2d 202, 209 (Pa. 1964).

Based upon the foregoing law, the orphans' court concluded that Decedent himself signed the will; therefore, it was valid pursuant to section 2502, and neither subsection (2) nor (3) applies in this case. Orphans' Court Opinion, 10/30/2015, at 5 n.16.[2]

---

[2] Because neither subsection (2) nor (3) applies in this case, Dorothy's argument that the will was "not executed before two subscribing witnesses" is irrelevant as the witnesses are necessary only when a will is not signed by the testator. **See** Dorothy's Brief at 18. **See Milleman's Estate**, **supra**.

This conclusion is supported by the record. At trial, Emma acknowledged that she assisted the Decedent with his signature.

[Emma:] And then it was time to sign. And he had a hard time signing and I helped him.

[Counsel:] And when you say you helped, would you describe for us specifically what you did?

[Emma:] Well, he had the pen in his hand, but it wasn't really pressing down, it was like going, so I guided his hand.

N.T., 11/25/2014, at 59.

Moreover, Attorney Pasquini corroborated this testimony. Attorney Pasquini testified that

when [he] gave [Decedent his] pen for signature, [Decedent] initially could hold the pen, but when he started to try to press down and move to sign his name he was having difficulty making any imprint. So at [his] behest [he] asked [Emma] to come over and help him hold the pen and guide his hand, which she did and that is how the signature was accomplished.

*Id*. at 44.

The trial court credited the testimony of both Emma and Attorney Pasquini, and we will not disturb that credibility determination. Thus, we agree with the orphans' court that Decedent signed the will; and therefore, subsections (2) and (3) do not apply. Accordingly, so long as the Decedent did not lack testamentary capacity at the time he signed the will, the will was signed in a valid manner and is not subject to challenge in that regard.

Dorothy goes on to argue that Decedent did indeed lack testamentary capacity at the time he signed the will. Specifically, she points to the fact

- 6 -

that "the brief time between the execution [of the will] and the date of death" caused there to be "no witnesses present who could testify that the Decedent was of sound mind and coherent at that time." Dorothy's Brief at 25.

> Testamentary capacity exists when the testator has intelligent knowledge of the natural objects of his bounty, the general composition of his estate, and what he or she wants done with it, even if his memory is impaired by age or disease. Neither old age, nor its infirmities, including untidy habits, partial loss of memory, inability to recognize acquaintances, and incoherent speech, will deprive a person of the right to dispose of his own property. In determining testamentary capacity, a greater degree of proof of mental incapacity is required than would be necessary to show the inability to conduct one's business affairs. Finally, testamentary capacity is to be ascertained as of the date of execution of the contested document.

*In re Estate of Smaling*, 80 A.3d 485, 494 (Pa. Super. 2013) (citations and quotation marks omitted).

With respect to the first element of the tripartite test, the orphans' court concluded that Emma was a natural object of Decedent's bounty. Decedent lived with Emma from 2008 until he was hospitalized in 2011. Once Decedent was hospitalized, Emma visited Decedent at the hospital "all day every day." N.T., 11/25/2014, at 56. Thus, the record supports the conclusion that Emma was a natural object of Decedent's bounty.

As to the second and third prongs of this test, Decedent's ability to comprehend the composition of his estate and its distribution at the time he

signed the will, the orphans' court credited the testimony of Attorney Pasquini.

> [Emma] offered the scrivner's credible testimony as to [Decedent's] intelligent understanding, as follows:
>
> > I said, well, [Decedent], how is your mind? How is your head feeling today? Is it clear? Do you think you can converse with me and understand what I'm saying? And he said, yes, I can. So my next question or protocol was I asked him, [Decedent], what is your understanding of what a will is? And he indicated it's a piece of paper that someone signs that will leave their stuff to someone that they want to, that they designate.
>
> [Emma] also testified that she was with [the Decedent] all day on the day he executed his will and stated credibly that he had no difficulty interacting with people and that "[h]e was aware of his surroundings," and "knew exactly what was going on." This testimony shows that [the Decedent] knew the significance of the occasion and import of the document that he would sign, and casts subsequent actions and words in that light.

Orphans' Court Opinion, 10/30/2015, at 7-8.

Moreover, Attorney Pasquini testified specifically that he "was satisfied that [Decedent] evidenced the clear intent that he had testamentary intent and had clear intention to sign this document as his Last Will & Testament." N.T., 11/25/2014, at 44. Thus, the record supports the orphans' court's conclusions that the Decedent "was clearheaded and possessed of a settled intent to dispose of his estate by leaving it in its entirety to [Emma]." Orphans' Court Opinion, 10/30/2015, at 10. Based on the foregoing, we agree with the orphans' court that Dorothy did not present testimony

sufficient to prove that Decedent lacked testamentary capacity at the time he signed his will. Accordingly, this claim fails.

Finally, Dorothy argues that the will should be invalidated because Decedent was subject to undue influence. Dorothy's Brief at 23-41.

> [U]ndue influence is a subtle, intangible and illusive [*sic*] thing, generally accomplished by a gradual, progressive inculcation of a receptive mind. Consequently, its manifestation may not appear until long after the weakened intellect has been played upon. Because the occurrence of undue influence is so often obscured by both circumstance and design, our Courts have recognized that its existence is best measured by its ultimate effect.

***Owens v. Mazzei***, 847 A.2d 700, 706 (Pa. Super. 2004).

> The resolution of a question as to the existence of undue influence is inextricably linked to the assignment of the burden of proof. Once the proponent of the will in question establishes the proper execution of the will, a presumption of lack of undue influence arises; thereafter, the risk of non-persuasion and the burden of coming forward with evidence of undue influence shift to the contestant. The contestant must then establish, by clear and convincing evidence, a *prima facie* showing of undue influence by demonstrating that: (1) the testator suffered from a weakened intellect; (2) the testator was in a confidential relationship with the proponent of the will; and (3) the proponent receives a substantial benefit from the will in question. Once the contestant has established each prong of this tripartite test, the burden shifts again to the proponent to produce clear and convincing evidence which affirmatively demonstrates the absence of undue influence.

***Smaling***, 80 A.3d at 493 (citations and footnotes omitted).

Because we have already held that that the orphans' court did not err in concluding that the will was executed in a valid fashion by Decedent, the burden shifts to Dorothy to establish the *prima facie* case. At the hearing,

Dorothy did not have an expert to testify about Decedent's intellect.[3] She also did not produce any testimony from nurses or doctors who cared for Decedent during the last month of his life. Thus, we agree with the orphans' court that Dorothy did not come forward with any evidence showing that Decedent suffered from a weakened intellect. **See** Orphans' Court Opinion, 10/30/2015, at 16 ("[Dorothy] introduced no admissible evidence of persistent confusion, forgetfulness, or disorientation.").

Furthermore, even if Dorothy had offered evidence of Decedent's weakened intellect, Dorothy's undue influence claim would still fail. Dorothy argues that she produced evidence of confidential relationship sufficient to shift the burden to Emma to disprove her undue influence.[4]

> For purposes of voiding a will on the ground of undue influence, a confidential relationship exists whenever circumstances make it certain that the parties did not deal on equal terms but that on the one side there was an overmastering influence, and on the other, dependence or trust, justifiably reposed. There is no precise formula for finding a confidential relationship, but generally it will be found when one justifiably reposes his trust in the hands of another who possesses some overmastering influence. This trust is given with confidence that it will be used in the testator's best interests.

---

[3] Dorothy offered portions of Decedent's medical records at the hearing. Decedent's sister also tried to testify about Dorothy's impressions of Decedent the day after the will was executed; however, the orphans' court did not permit this testimony because it was hearsay. N.T., 11/25/2014, at 24-29. Dorothy did not testify at the hearing.
[4] There is no question as to the third prong of the *prima facie* case, as Emma did receive the Decedent's entire estate in the will.

*Burns v. Kabboul*, 595 A.2d 1153, 1163 (Pa. Super. 1991) (internal quotation marks and citations omitted).

The orphans' court concluded that the relationship between Emma and Decedent "was most akin to the spousal relationship." Orphans' Court Opinion, 10/30/2015, at 15. We observe that "[a] spousal relationship does not automatically translate into a confidential relationship for purposes of determining the presence of undue influence. [I]n any given case it is a question of fact whether the marital relationship is such as to give [one spouse] dominance over [the other] or to put [that spouse] in a position where words of persuasion have undue weight." *Smaling*, 80 A.3d at 498-99 (internal quotation marks and citation omitted).

Instantly, the orphans' court concluded that "[Dorothy] failed to prove by clear and convincing evidence that a confidential relationship existed between [Emma] and [Decedent]." Orphans' Court Opinion, 10/30/2015, at 13.

> [I]t was never proved that [Emma] had a power of attorney over [Decedent]. Nor was there any evidence presented that [Emma] and [Decedent] were not on equal terms. Thus, as a relationship of affection, and without evidence of "an overmastering influence" on [Decedent,] the relationship between [Decedent] and [Emma] fell below the level of "confidential."

*Id*. at 15.

There was no evidence presented that the parties did not deal on equal terms during the three years they lived together. In fact, the record

- 11 -

establishes that Decedent designated Emma as the beneficiary of his IRA in 2008, well before the events at issue here. N.T., 11/25/2014, at 60. Accordingly, we discern no abuse of discretion in the conclusion that the relationship between Emma and Decedent was not a confidential relationship.

Because Dorothy did not establish by clear and convincing evidence all three elements of a *prima facie* case, the burden did not shift back to Emma to produce clear and convincing evidence of the absence of undue influence. Thus, Dorothy's claim fails.

Having concluded that the trial court did not err in concluding that the will was signed properly by Decedent who did not lack testamentary capacity, and that the will was not the product of undue influence, we affirm the decree of the orphans' court.[5]

Decree affirmed.

Judge Stabile joins.

Judge Olson files a dissenting opinion.

---

[5] I agree with the law set forth in the learned dissenting opinion authored by Judge Olson. However, because this case has proceeded in this manner since 2012 with full knowledge of the court and by consent of the parties, judicial economy is best served by affirming the decree at this juncture.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/20/2016