J-S21034-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ESTATE OF ALVENA T. MILLER, DECEASED | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: RONALD A. MILLER | : : : : : : : | |
| | : | No. 1666 MDA 2022 |

Appeal from the Decree Entered October 31, 2022
In the Court of Common Pleas of Northumberland County Orphans' Court
at No(s): OC-18-0141

BEFORE: BOWES, J., NICHOLS, J., and PELLEGRINI, J.*

MEMORANDUM BY PELLEGRINI, J.:     **FILED: JULY 25, 2023**

Ronald A. Miller (Miller) appeals from the decree entered in the Court of Common Pleas of Northumberland County (orphans' court) finding that he breached his fiduciary duty as the Executor of the estate of his mother, Alvena T. Miller (Decedent). Miller challenges the orphans' court's determination that a gifting agreement Decedent executed before her death was the product of his undue influence. We affirm.

**I.**

**A.**

The relevant facts and procedural history of this case are as follows. Decedent passed away in June of 2015 at the age of 93 and was suffering

_____

* Retired Senior Judge assigned to the Superior Court.

from advanced dementia at the time. Decedent named her son, Miller, as the Executor in her will and her three grandsons as the beneficiaries to share equally in her estate.

Miller did not submit Decedent's will for probate until he was directed to do so by court order in October of 2017, over two years after Decedent's death. Miller was issued letters testamentary and he listed the value of Decedent's personal property in the estate at $900. Miller ignored several court orders to provide an accounting and he averred that a safe deposit box owned by Decedent was empty at her death. Miller filed a first and final accounting on December 18, 2019, over two years after he was appointed Executor. Miller's brother, Joseph Miller, Jr. (J.M.) and his son, Joseph Miller III, filed objections contending that several estate assets were not included in the accounting including $42,525 in cash, numerous coins, silver items and the contents of Decedent's safe deposit box.[1]

**B.**

The orphans' court held multiple hearings in April of 2021 and August of 2022 at which several witnesses testified concerning Decedent's mental condition in the years leading up to her death. Relevant to this appeal, the testimony also addressed the validity of a gifting agreement Decedent

---

[1] Decedent named Miller's two sons and Joseph Miller III as the beneficiaries of her will, executed in March of 2014.

executed in July of 2014 giving a valuable coin and currency collection to Miller only. This document was prepared by Frank William Garrigan, Esq., approximately four months after Decedent executed her will. Miller and Attorney Garrigan have a professional relationship in that Miller is the Executive Director of the Shamokin Housing Authority and Attorney Garrigan is the solicitor.

Miller testified that during the course of the administration of Decedent's estate, he did not take anything to which he was not entitled. Miller stated that he gave his attorney approximately $5,000 in coins for deposit in the estate account. (*See* N.T. Hearing, 4/20/21, at 79-80). Miller explained that Decedent had directed him not to bury her with her jewelry on, that he had placed her diamond engagement ring in her jewelry box, and that the box "disappeared" after she died. (*Id.* at 83). He averred that he did not take the box or any of the jewelry belonging to his mother.

Miller also testified that prior to her death, Decedent had placed several coins and a detailed list stating their denomination and minting information in a safe deposit box in his name at Susquehanna Bank. Miller indicated that he removed the contents of the safe deposit box around the time of her death because she gifted it to him through the gifting agreement prepared by Attorney Garrigan in 2014. Miller stated that he drove Decedent to Attorney Garrigan's office to execute the gifting agreement while en route to her sister's home for one of their regular visits. (*See id.* at 88).

On cross-examination, Miller acknowledged that Decedent had made a will in March of 2014 and that he had contacted Attorney Garrigan to prepare it. However, he denied having any knowledge of the terms of the will, including that he had been named the sole Executor until after Decedent died. Miller relayed that Decedent had given him an envelope containing the will and instructed him not to open it until her death. He averred that he opened the envelope at a family meeting on July 18, 2015, about three weeks after she died. (*See id.* at 102). Miller also indicated that before Decedent died, he and his brother J.M. found $42,000 in cash in her freezer in April of 2015. (*See id.* at 106). Miller testified that when he asked Decedent what to do with it, she said: "Give it to your children." (*Id.* at 112). Counsel for Miller stipulated that the $42,000 transfer from Decedent to his children was not recorded on the inheritance tax return he filed and that the gifting agreement was not listed on that return.

Attorney Garrigan testified that he prepared Decedent's will in March of 2014 and she had indicated that she wanted Miller to be the Executor and her three grandsons to be the beneficiaries, to share equally. Attorney Garrigan indicated that they did not discuss her assets in detail because she had no specific bequests and there was no need for a capacity determination because she was "perfectly lucid." (N.T. Trial, 8/23/22, at 43). He relayed that if he had taken any notes regarding Decedent's will, they were likely destroyed when the document was executed. Attorney Garrigan testified that he

prepared the gifting agreement on July 24, 2014, at Decedent's request because she wanted to give her coin collection to Miller. He relayed that she brought an extensive 30-page handwritten attachment that she had prepared detailing the coin collection to his office and he attached the list to the one-page gifting agreement.

On cross-examination, Attorney Garrigan acknowledged that Miller is one of his clients, that they share a professional relationship, and that Miller may have referred Decedent to him to draft her will. He testified that he did not know anything about Decedent's medical condition, nor did he ask about it "because she completely seemed to understand everything that was going on." (*Id.* at 53). With regard to the gifting agreement, he explained that Decedent wanted to put the gift in writing to avoid fighting within the family about the coins, and he indicated that Miller was not in the room when she signed it.

Dr. Gurdial Singh testified as a medical expert, board certified in psychiatry. He had conducted an examination of Decedent and was consulted to treat her on three occasions in February, April and May of 2015. During the first consultation, Decedent was in the hospital because of a fall, at which time she appeared confused and was unable to provide any information as to where she was or why she was there. Dr. Singh relayed that Decedent "was able to tell her date of birth, but not much of anything else. And she thought she was in a church at the time." (*Id.* at 12). Dr. Singh stated his psychiatric

impression that Decedent was suffering from advanced dementia, that she had dementia for at least five or six years, and that she was not capable of making financial decisions.

During Dr. Singh's second consultation with Decedent, she was in a nursing home and was more confused than in the initial visit. He observed that she was argumentative, disruptive and was wandering into and out of rooms. Dr. Singh testified that when he saw Decedent in May of 2015, she had declined further and her behavioral problems were progressing. When asked about Decedent's ability to make the financial gift to Miller one year prior, Dr. Singh indicated that Decedent was likely suffering from dementia at that time, with impaired judgment and lack of capacity to reason or process information.

On cross-examination, Dr. Singh clarified that he did not meet with Decedent in July of 2014, and that although he believed she would have had dementia at that time, he could not categorize the degree of severity. (**See id.** at 20-21). However, Dr. Singh stated that at the time he first saw Decedent, she already had severe dementia, and that six months prior to that, she would have had at least moderately severe dementia because the hallmark of the disease is a slow and gradual progression.

J.M. testified that he observed Decedent's mental condition begin to deteriorate in 2012-2013 in that she would mix up her pills, forget to turn the

stove off and had trouble remembering names and people. He was not aware of the gifting agreement concerning his brother until the hearing.

In contrast, Decedent's niece Carol Tressler testified that she visited with the Decedent on a weekly basis in March-July of 2014 and she did not have concerns about Decedent's medical condition or her ability to follow conversations during that timeframe. Ms. Tressler did notice a change in Decedent's behavior in 2015 when she entered the nursing home.

Alakananda Chakrabarty, M.D., testified by deposition as an expert witness, board certified in internal medicine. Dr. Chakrabarty treated Decedent for several medical conditions, including coronary heart disease, stroke and dementia/Alzheimer's disease from about 2013 until 2015. (*See* N.T. Deposition, 4/13/22, at 6-7). Decedent had already been diagnosed with dementia in 2013 and she was taking medication for the disease, which Dr. Chakrabarty described as progressive, causing cognitive impairment and memory loss. Dr. Chakrabarty indicated that although she could not state for certain the degree to which Decedent was cognitively impaired on the day she executed her will, she would have had at least moderate degrees of dementia at that time. Dr. Chakrabarty indicated that dementia patients can be easily influenced and taken advantage of because they are incapable of understanding whether a decision is favorable to them. Dr. Chakrabarty opined that during the time she treated Decedent, she was not capable of making sound decisions about her own health or well-being. (*See id.* at 14).

**C.**

On October 31, 2022, the orphans' court entered its decree finding that Miller breached his fiduciary duty as Executor of Decedent's estate; had obtained and failed to include $44,908 in coins in the estate and retained items including stained glass and a shot gun for himself; Decedent was suffering from advanced dementia when she made the gifting agreement giving a portion of her estate to Miller in July of 2014 and was subject to undue influence rendering the document void. The orphans' court ordered Miller to return to the estate all sums received under the gifting agreement, pay a surcharge of $2,500 to the estate, forfeit his commission and reimburse petitioners' legal fees and costs. (*See* Decree, 10/31/22, at 1-2). Miller timely appealed and he and the court complied with Rule 1925. *See* Pa.R.A.P. 1925(a)-(b). In its Rule 1925 opinion, the orphans' court stated its determinations that Miller was in a confidential relationship status with Decedent for purposes of his undue influence decision and that, without any justification, Miller engaged in dilatory tactics before and after Decedent's death to retain her funds and assets for his own benefit, to the exclusion of the proper beneficiaries. (*See* Orphans' Court Opinion, 2/09/23, at 3-4).

**II.**

On appeal, Miller challenges the orphans' court's determination that the gifting agreement is invalid as a product of undue influence.[2] Miller first disputes the court's finding that he and Decedent were in a confidential relationship, where the record shows that he was not involved in her financial and estate planning decisions and that Decedent instead sought out and obtained the counsel of Attorney Garrigan. (**See** Miller's Brief, at 16-27). Miller next maintains that even if he were in a confidential relationship with Decedent, any presumption of undue influence was rebutted by the testimony of Attorney Garrigan which shows that Decedent independently executed the gifting agreement and there is no evidence that Miller exercised an overmastering influence on her. (**See id.** at 27-30). Lastly, Miller disputes

_____

[2] Our standard of review of the findings of an orphans' court is deferential.

> When reviewing a decree entered by the Orphans' Court, this Court must determine whether the record is free from legal error and the court's factual findings are supported by the evidence. Because the Orphans' Court sits as the fact-finder, it determines the credibility of the witnesses and, on review, we will not reverse its credibility determinations absent an abuse of that discretion.
>
> However, we are not constrained to give the same deference to any resulting legal conclusions. Where the rules of law on which the court relied are palpably wrong or clearly inapplicable, we will reverse the court's decree.

**In re Estate of Walter**, 191 A.3d 873, 878–79 (Pa. Super. 2018) (citations omitted).

the court's finding that Decedent lacked the capacity to execute the gifting agreement where Attorney Garrigan and Ms. Tressler testified that they did not have concerns about Decedent's mental state, while the testimony of Drs. Singh and Chakrabarty was "speculative as to the date of the Gifting Agreement." (*Id.* at 37; *see id.* at 31-38).[3]

We begin by observing that "undue influence is a subtle, intangible and illusive thing, generally accomplished by a gradual, progressive inculcation of a receptive mind." *In re Staico*, 143 A.3d 983, 990 (Pa. Super. 2016) (citation omitted). "Because the occurrence of undue influence is so often obscured by both circumstance and design, our Courts have recognized that its existence is best measured by its ultimate effect." *Id.* (citation omitted).

> **Weakened intellect in the context of a claim of undue influence need not amount to testamentary incapacity and will generally be proven through evidence more remote in time from the actual date of the will's execution**. While Pennsylvania courts have not established a bright-line test by which **weakened intellect can be identified to a legal certainty, they have recognized that it is typically accompanied by persistent confusion, forgetfulness and disorientation**. Importantly, in an undue influence case, the Orphans' Court has greater latitude to consider medical testimony describing a testator's condition at a time remote from the date that the contested will was executed.

*In re Estate of Byerley*, 284 A.3d 1225, 1237–38 (Pa. Super. 2022) (citations and brackets omitted; emphasis added).

---

[3] We address Miller's issues, all of which concern the validity of the gifting agreement, together for ease of disposition. (*See* Miller's Brief, at 5).

The resolution of a question as to the existence of undue influence is inextricably linked to the assignment of the burden of proof. Once the proponent of the will in question establishes the proper execution of the will, a presumption of lack of undue influence arises; thereafter, the risk of non-persuasion and the burden of coming forward with evidence of undue influence shift to the contestant. The contestant must then establish, by clear and convincing evidence, a *prima facie* showing of undue influence by demonstrating that: (1) the testator suffered from a weakened intellect; (2) the testator was in a confidential relationship with the proponent of the will; and (3) the proponent receives a substantial benefit from the will in question. Once the contestant has established each prong of this tripartite test, the burden shifts again to the proponent to produce clear and convincing evidence which affirmatively demonstrates the absence of undue influence.

*In re Staico*, *supra* at 990 (citation omitted)

In this context, "a confidential relationship exists whenever circumstances make it certain that the parties did not deal on equal terms but that on the one side there was an overmastering influence, and on the other, dependence or trust, justifiably reposed." *Id.* at 991 (citation omitted). While there is no precise formula for finding a confidential relationship, it will generally be found when a person justifiably puts his trust in the hands of another who possesses some overmastering influence, with confidence that it will be used in the person's best interests. *See id.*

In this case, Miller's own testimony that he drove his mother twice a week to visit relatives, discussed burial plans with her, took her engagement ring for safekeeping and that she entrusted him with a copy of her will before she died, undercuts his claim that they shared no confidential relationship. Miller's testimony also reflects that he referred Decedent to his colleague,

Attorney Garrigan, for preparation of her estate planning documents and he drove her to Attorney Garrigan's office to execute her will, which named him as the Executor. Additionally, Dr. Singh and Dr. Chakrabarty testified to the susceptibility of dementia patients being taken advantage of by others, given their inability to assess what is in their best interests and lack of capacity to make sound financial decisions. Based on the foregoing, we conclude that Miller had a confidential relationship with Decedent and took advantage of her weakened condition to the detriment of her named beneficiaries.

With regard to Miller's contention that any presumption of undue influence was rebutted, he relies heavily on the testimony of Attorney Garrigan and Ms. Tressler for the proposition that Decedent was lucid during the timeframe she executed the gifting agreement and acted independently in preparing it. However, the orphans' court, as fact-finder, plainly did not find the testimony of Attorney Garrigan credible in light of the extensive medical testimony indicating to the contrary. Because we discern no abuse of discretion in the orphans' court's credibility determinations, which are fully supported by the record, we decline to disturb them. ***See In re Estate of Walter***, ***supra*** at 878.

Last, with respect to Miller's contention that the evidence failed to demonstrate Decedent's lack of capacity to execute the gifting agreement, we emphasize that "weakened intellect in the context of a claim of undue influence need not amount to testamentary incapacity and will generally be

proven through evidence more remote in time" from the date of execution of the document, and can be identified using markers such as persistent confusion, forgetfulness and disorientation. *See In re Estate of Byerley*, *supra* at 1237.

Here, the orphans' court heard testimony from two medical experts who had treated Decedent over an extended period of time describe her as a long-term dementia patient who was likely suffering from at least moderate dementia when she executed the gifting agreement with impaired judgment and lack of ability to reason, given her advanced disease and its hallmark of a slow and gradual progression. J.M. likewise testified as one of Decedent's caretakers that he first noticed signs of her mental decline several years before her death. Upon review of the record in conjunction with the findings of the orphan's court, we agree with its conclusion that Decedent was in a steady mental decline rendering her incapable of making reasoned decisions at the time she executed the gifting agreement.

In sum, because we find no merit to Miller's challenges to the orphans' court's decision to set aside the gifting agreement as a product of undue influence, we affirm its decree setting it aside as invalid.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 07/25/2023