J-A27022-17

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| IN RE: ESTATE OF JEAN B. AUGUSTINE, DECEASED, ALCINDA A. NENSEL, NANCY PALMER AND SALLY A. LINT | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| PETER C. AUGUSTINE AND DANIEL E. AUGUSTINE | : : | |
| | : | |
| APPEAL OF: ALCINDA A. NENSEL, NANCY PALMER AND SALLY A. LINT | : : | No. 524 WDA 2017 |

Appeal from the Decree March 6, 2017
In the Court of Common Pleas of Somerset County Orphans' Court at
No(s): No. 56-15-00126

BEFORE: BENDER, P.J.E., SHOGAN, J., and MUSMANNO, J.

MEMORANDUM BY SHOGAN, J.: FILED DECEMBER 08, 2017

Nancy Palmer, Alcinda Nensel, and Sally Lint (collectively, "Sisters") appeal the orphans' court decree denying their "Appeal from Decree of Probate and Petition for Citation for Rule to Show Cause" and their "Petition for Citation Sur Appeal from Probate." Sisters claim their brothers, Peter and Daniel Augustine ("Brothers"), exerted undue influence on the siblings' mother, Jean Augustine ("Decedent"), resulting in Brothers' inheritance of the bulk of Decedent's estate. We affirm.

Following the death of her husband Edward Augustine on May 30, 2009, Decedent executed a durable power of attorney ("POA") on June 16, 2009, naming Nancy and Sally as agents. The next day, Decedent executed a will, devising all of her property equally to her five children.

Decedent's demeanor toward her daughters changed noticeably in or around the fall of 2009, after: Nancy invited an appraiser to ascertain the value of Decedent's property; Sisters proposed an auction of Decedent's property; Sisters helped Decedent sell her boat for $800; and Decedent decided to sell her boat slip. Brothers were upset about the proposed auction, thought the boat was worth $4,500, and wanted to keep the boat slip. After Brothers shared their feelings with Decedent, she removed Nancy and Sally as agents and named Brothers as agents on October 15, 2009.

Despite a deteriorating relationship with her daughters, Decedent executed a new will on February 24, 2010, again devising all of her property equally to her five children. Then, in March 2010 and January 2011, Brothers assisted Decedent in purchasing and/or funding investment contracts, which ultimately resulted in substantial transfers of wealth to Brothers as beneficiaries. Additionally, between June 30, 2009, and March 24, 2011, Decedent met with Attorney James B. Courtney approximately five times to discuss oil and gas leases. Brothers were active participants in those meetings. During the period Attorney Courtney worked with Decedent, he observed that she maintained her sense of humor, she was able to understand what he told her, and "[s]he never stopped giving [him] a hard time." N.T. Vol. 1, 12/12/16, at 1.50–1.51.

At a March 16, 2011 meeting with Attorney Courtney, Decedent expressed her desire to disinherit her daughters. In revising Decedent's will,

Attorney Courtney convinced Decedent not to disinherit her daughters, but he did honor her request to provide the greater share of her estate to Brothers. Consequently, Decedent executed two more wills, one on March 16, 2011, shifting the majority of Decedent's estate to Brothers, followed by an amended will on March 24, 2011, that specified bequests favoring Brothers.

On May 16, 2011, Decedent was hospitalized briefly for a gastrointestinal issue. As of that admission, Decedent's past medical history included "Alzheimer's disease," and her medical records contained evidence of cognitive impairment. Sisters' Exhibits K and L. On March 20, 2015, Decedent died in a personal care home in Maryland; the cause of death indicated on her death certificate was "dementia." Sisters' Exhibit H.

Brothers submitted the March 24, 2011 will for probate on March 27, 2015, and received letters testamentary. Sisters appealed the decree of probate on March 24, 2016. Various filings ensued. After denying Sisters' motion for a jury trial, the orphans' court held a three-day nonjury trial beginning on December 12, 2016. At trial, Sisters asserted that Brothers exercised undue influence on Decedent who suffered from a weakened intellect. In support of their position, Sisters relied on their observations of Decedent's forgetfulness, confusion, and inability to carry out the basics of daily living, as well as Decedent's medical records and death certificate. The orphans' court admitted Decedent's medical records and death certificate for

the limited purpose of proving the time and fact of Decedent's hospitalization and death, but not as substantive evidence of Decedent's alleged cognitive deficiencies. N.T. Vol. 1, 12/12/16, at 1.3–1.10; N.T. Vol. 2, 12/13/16, at 2.120–123. In response, Brothers relied on a rift between Decedent and Sisters involving Decedent's property and the testimony of Decedent's doctor and attorney to support their assertion that Decedent showed no signs of weakened intellect at the time she executed the contested will.

The orphans' court concluded that Sisters proved two of the three elements of a claim of undue influence, i.e., existence of a confidential relationship with the will proponent and receipt of a substantial benefit by the will proponent, but they failed to prove that Decedent suffered from a weakened intellect. Orphans' Court Memorandum, 3/8/16, at 8, 16, 27–28. In support of its ruling, the orphans' court credited testimony that Decedent's physician and attorney did not observe her as having a weakened intellect in March 2011 and that Decedent exercised her will in opposition to Brothers' influence on multiple occasions. Id. at 18–21, 27. Sisters filed the instant appeal, and, along with the orphans' court, complied with Pa.R.A.P. 1925.

Sisters present the following questions for our consideration:

I. Did the trial court commit an error of law or abuse of discretion in refusing to admit as substantive evidence observations of forgetfulness, confusion, disorientation and cognitive impairment contained in authenticated medical records from Uniontown Hospital as well as that portion of

> [Decedent's] death certificate that identified "dementia" as the cause of death?
>
> II.     Generally, did the trial court commit an error of law or abuse of discretion in determining that the evidence adduced at trial relative to the weakened intellect issue favored [Brothers] when, in fact, nearly all of [Sisters'] testimony on this issue was undisputed, and also when [Decedent's] medical records and the testimony of [Decedent's] primary care physician established that [Decedent] suffered from cognitive impairments and deficits, memory loss, forgetfulness, confusion and disorientation?

Sisters' Brief at 4.

The scope and standard of review on appeal from a decree of the orphans' court in a will contest are as follows:

> The record is to be reviewed in the light most favorable to [the contestant], and review is to be limited to determining whether the trial court's findings of fact were based upon legally competent and sufficient evidence and whether there is an error of law or abuse of discretion. Only where it appears from a review of the record that there is no evidence to support the court's findings or that there is a capricious disbelief of evidence may the court's findings be set aside. In re Bosley, 26 A.3d 1104, 1107 (Pa.Super. 2011) (internal citations omitted).

In re Estate of Schumacher, 133 A.3d 45, 49-50 (Pa. Super. 2016). "Because the Orphans' Court sits as the fact-finder, it determines the credibility of the witnesses and, on review, we will not reverse its credibility determinations absent an abuse of that discretion." Estate of Pendergrass, 26 A.3d 1151, 1153 (Pa. Super. 2011) (quoting In re Estate of Harper, 975 A.2d 1155, 1158 (Pa. Super. 2009)) (internal citation omitted).

Sisters first argue that the orphans' court erred in denying the admission of Decedent's medical records and death certificate as substantive evidence of her weakened intellect. Sisters' Brief at 42. "[I]t is well settled that the admissibility of evidence is a determination left to the sound discretion of the trial court, and it will not be overturned absent an abuse of discretion or misapplication of law." In re Fiedler, 132 A.3d 1010, 1025 (Pa. Super. 2016) (quotations and citations omitted).

Although Sisters recognize that Decedent's medical records are hearsay, they cite the business records exception of Pa.R.E. 803(6) and the medical treatment exception of Pa.R.E. 803(4) as authority for admission of the records. Sisters' Brief at 42. Those exceptions provide as follows:

> (4) Statement Made for Medical Diagnosis or Treatment. A statement that:
>
> (A) is made for--and is reasonably pertinent to--medical treatment or diagnosis in contemplation of treatment; and
>
> (B) describes medical history, past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof, insofar as reasonably pertinent to treatment, or diagnosis in contemplation of treatment.
>
> * * *
>
> (6) Records of a Regularly Conducted Activity. A record (which includes a memorandum, report, or data compilation in any form) of an act, event or condition if:
>
> (A) the record was made at or near the time by--or from information transmitted by--someone with knowledge;
>
> (B) the record was kept in the course of a regularly conducted activity of a "business", which term includes business,

institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit;

(C) making the record was a regular practice of that activity;

(D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and

(E) the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness.

Pa.R.E. 803(4), (6).

Sisters contend that medical records of Decedent's hospital admission two months after executing the contested will were admissible as business records. Sisters' Brief at 43. Additionally, Sisters reason that the medical records contained mere observations and, therefore, were admissible as substantive evidence of Decedent's weakened intellect. According to Sisters, the medical records established, inter alia, that "Decedent was unable to consent to her own treatment;" she "suffered from memory loss and forgetfulness"; she "was completely disoriented as to person, place and time;" and "she suffered from cognitive impairment." Id. at 47. They argue that the comments were "not otherwise medical diagnoses, conclusions or opinions" and, therefore, "the healthcare professionals who reduced these observations to writing need not appear in court." Id. at 48.

In support of their position, Sisters rely on In re Mampe, 932 A.2d 954 (Pa. Super. 2007), which involved a will contest based on an assertion of undue influence. Sisters cite Mampe for the proposition that "confusion,

forgetfulness, and disorientation are phenomena that are observable and within the realm of common knowledge." Sisters' Brief at 44 (citing Mampe, 932 A.2d at 962).

Contrarily, Brothers argue that Decedent's medical records "refer to a 'cognitive deficit', note issues with respect to the Decedent's problem solving capabilities, and state[d] that the Decedent suffered from confusion." Brothers' Brief at 15 (internal quotation marks and citations omitted). According to Brothers, "each entry in the Medical Records was made after an evaluation or assessment by a trained healthcare provider at Uniontown Hospital." Id. (citation omitted). Brothers further contend, "The statements found in the Medical Records are exactly the type of medical opinion evidence that is deemed inadmissible absent a corroborating witness." Id. Moreover, Brothers distinguish Mampe: "The evidentiary issue before the court in Mampe was not the admissibility of medical record testimony as an exception to the hearsay rule. Instead, the court considered whether lay testimony regarding the weakened intellect of a testatrix was admissible under Pa.R.E. 701." Id. at 16 (citing Mampe, 932 A.2d at 960). Brothers also challenge Sisters' reliance on Pa.R.E. 803(4): "[T]he statements [Sisters] seek to admit were not made for the purpose of receiving treatment . . . in relation to the gastrointestinal malady" for which she was hospitalized. Brothers' Brief at 17.

The orphans' court addressed Sisters' medical records issue as follows:

> We did not refuse wholesale to admit as substantive evidence Decedent's medical records. See, e.g., Trial Tr. 1.4–5 (the [c]ourt stating, "The records are admissible to show the fact of hospitalization, treatment prescribed and symptoms given"); id. at 1.8–10. However, we limited admission of the medical records to "merely . . . prove facts, such as the event of hospitalization, treatment prescribed, symptoms given, or the existence of some readily ascertained substance or chemical within the body." Commonwealth v. Seville, 405 A.2d 1262, 1264 (Pa. Super. Ct. 1979). We interpreted "symptoms given" to be those symptoms presented by the patient or subject of the records, as opposed to symptoms observed or perceived by hospital staff, especially observations by staff that were vague and laden with interpretation, such as "unable to problem solve," which we believed were closer to diagnoses and/or opinions than observable facts. Furthermore, [Sisters] did not offer testimony from any medical or hospital staff in support of said medical records which would have enabled [Brothers'] counsel to cross examine the witnesses with respect to the accuracy, reliability and veracity of the objectionable information in the medical records.

Orphans' Court Pa.R.A.P. 1925(a) Opinion, 5/16/17, at 2; see also Orphans' Court Memorandum, 3/8/17, at 28 n.2 (discussing medical records and death certificate); N.T. Vol. 2, 12/13/16, at 2.2–2.6 (discussing medical records); N.T. Vol. 3, 12/14/16, at 3.82–3.88 (discussing medical records).

As observed by the orphans' court, the Seville case supports the exclusion of Decedent's medical records as substantive evidence of her mental state. The Seville Court explained: "[H]ospital records are admissible to show the fact of hospitalization, treatment prescribed, and symptoms" provided by the patient, but "opinions, diagnoses, and conclusions contained therein are not admissible." Seville, 405 A.2d at

- 9 -

1264. The orphans' court opined, and we agree, that the statements Sisters sought to admit were not just lay observations; they were opinions, diagnoses, and conclusions that were inadmissible absent a corroborating witness. Orphans' Court Pa.R.A.P. 1925(a) Opinion, 5/16/17, at 2–3 (citing N.T. Vol. 1, 12/12/16, at 1.3–1.10; N.T. Vol. 3, 12/14/16, at 3.82–3.88). Moreover, as Brothers assert, the statements Sisters sought to admit were not related to her hospitalization for a gastrointestinal malady and, therefore, did not satisfy that requirement of Pa.R.E. 803(4). We further agree with the orphans' court and Brothers that Mampe is inapposite to the case at hand. The Mampe Court addressed the admissibility of lay testimony regarding the decedent's behaviors,[1] not the admissibility of observations made by medical and hospital professionals. Based on the foregoing, we discern no abuse of the orphans' court's discretion in excluding Decedent's medical records as substantive evidence of her alleged weakened intellect.

As part of their first issue, Sisters also challenge the orphans' court exclusion of Decedent's Maryland death certificate, specifically, the reference to "dementia" as the cause of death. Sisters' Brief at 48. Sisters argue that:

_____

[1] The record supports Brothers' assertion that Sisters' testimony regarding their personal observations of Decedent's behavior was admitted without objection. Brothers' Brief at 16; N.T. Vol. 1, 12/12/16, at 160, 168, 172–188; N.T. Vol. 2, 12/13/16, at 38, 101–102, 105–107, 113, 124, 137.

> [w]hile it is true that the [sic] 35 P.S. §450.810 expressly states that any record or duly certified copy of a record filed with the Pennsylvania Department of Health shall constitute prima facie evidence of its contents, Section 450.810 does not necessarily stand for the inverse proposition – i.e., that if a record is not filed with the department, it cannot under any circumstances be deemed prima facie evidence of its contents…. Section 450.810 is completely silent on how to treat an authenticated, original death certificate issued by a sister state.

Id. at 51. According to Sisters, an authentic Maryland death certificate is entitled to the same rebuttable presumption of trustworthiness afforded an authentic Pennsylvanian public record. Id. at 52.

Brothers counter that the orphans' court properly excluded Decedent's death certificate because "it is not entitled to the presumptions set forth in the Vital Statistics Law." Brothers' Brief at 18. Brothers explain, "[T]he contents of the [death] certificate are admissible only insofar as they would be admissible if the official preparing the same had been called as a witness." Id. (citing Pittsburgh Nat. Bank v. Mutual Life Ins. Co. of New York, 417 A.2d 1206 (Pa. Super. 1980)).

The orphans' court explained its exclusion of the death certificate as follows:

> [Sisters] have also attempted to demonstrate undue influence, or at least bolster their undue influence claim, through use of … the fact that [D]ecedents' Maryland death certificate states that she died of dementia, the implication being that if the [D]ecedent died from dementia, she was likely to have suffered from it in 2011, and [Brothers] had exploited her dementia, which is how they convinced her to make them beneficiaries of her investments.

> We ruled that the death certificate was inadmissible for the purpose of establishing that the [D]ecedent's death was related to dementia which had been in onset for years. Trial Tr. 2.81, 2.122; [Sisters'] Ex. H. However, even considering it arguendo, we question its relevance: the declarant, P. Daniel Miller, D.O., was not present to testify in court, so the basis for his conclusion that dementia caused [D]ecedent's death was not established; moreover, even if the [D]ecedent died from complications resulting from dementia, her death occurred approximately four years after her execution of the will, and while her ostensible dementia may have developed years before her death, there is no evidence from which we could conclude that she necessarily or even probably suffered from dementia in March, 2011.

Orphans' Court Memorandum, 3/8/17, at 28 n.2; see also, N.T. Vol. 2, 12/13/16, at 2.120–2.123 (explaining why a death certificate is not admissible as substantive evidence).

Upon review, we conclude that Sisters' death-certificate challenge lacks merit for two reasons. First, the Pittsburgh National Bank case supports the orphans' court's exclusion of the Maryland death certificate as substantive evidence of Decedent's cause of death. Therein, we held that an official Pennsylvania death certificate was not admissible as substantive evidence to establish that an insured's death was accidental. Pittsburgh National Bank, 417 A.2d at 1209. Second, any record properly filed with the Pennsylvania Department of Health and not a delayed or corrected record or related to paternity constitutes prima facie evidence of its contents. Vital Statistics Law, 35 P.S. § 450.810. Here, however, Decedent's death certificate was issued by the Maryland Department of Health; therefore, it does not constitute prima facie evidence of Decedent's

mental acuity. In light of these two authorities, and the absence of contrary authority, we reject Sisters' argument that a foreign death certificate is entitled to the same presumption as a Pennsylvania death certificate. Thus, we discern no abuse of the orphan's court's discretion in excluding the Maryland death certificate as substantive evidence of Decedent's alleged weakened intellect.

Sisters' second issue challenges the orphans' court's conclusion that they presented insufficient evidence of undue influence. Sisters' Brief at 55. Sisters argue that, like the testator in Estate of Schumacher, Decedent "was an independent and strong-willed woman." Sisters' Brief at 57. However, they continue, "the factual record is replete with substantial evidence of [Decedent's] forgetfulness, confusion and disorientation," including medical records and testimony indicating that Decedent suffered from a weakened intellect. Id. at 59–62.

> In resolving this claim, we are guided by the following analysis:
>
> Although our cases have not established a bright-line test by which weakened intellect can be identified to a legal certainty, they have recognized that it is typically accompanied by persistent confusion, forgetfulness and disorientation. The Orphans' Court's mandate in assessing such evidence is relatively broad. If the court's decision rests upon legally competent and sufficient evidence, we will not revisit its conclusions. Under no circumstance will we substitute our judgment of credibility for that of the Orphans' Court.

Owens v. Mazzei, 847 A.2d 700, 707 (Pa. Super. 2004). The test we apply on review is not whether we "would have reached the same result, but

rather whether the findings of fact approved by the [orphans'] court . . . are based upon legally competent and sufficient evidence and whether the court below committed an error of law or abused its discretion." In re Estate of Clark, 334 A.2d 628, 635 (Pa. 1975).

"The resolution of a question as to the existence of undue influence is inextricably linked to the assignment of the burden of proof." In re Estate of Smaling, 80 A.3d 485, 493 (Pa. Super. 2013) (quoting In re Clark's Estate, 334 A.2d at 632). "Once the proponent of the will in question establishes the proper execution of the will, a presumption of lack of undue influence arises; thereafter, the risk of non-persuasion and the burden of coming forward with evidence of undue influence shift to the contestant." Estate of Smaling, 80 A.3d at 493 (internal citations omitted). Thus, the will contestant must establish:

> by clear and convincing evidence, a prima facie showing of undue influence by demonstrating that: (1) the testator suffered from a weakened intellect; (2) the testator was in a confidential relationship with the proponent of the will; and (3) the proponent receives a substantial benefit from the will in question. Once the contestant has established each prong of this tripartite test, the burden shifts again to the proponent to produce clear and convincing evidence which affirmatively demonstrates the absence of undue influence.

Id. (internal citations omitted).

> Undue influence is a subtle, intangible and illusive thing, generally accomplished by a gradual, progressive inculcation of a receptive mind. Consequently, its manifestation may not appear until long after the weakened intellect has been played upon. Because the occurrence of undue influence is so often obscured

by both circumstance and design, our Courts have recognized that its existence is best measured by its ultimate effect.

Owens, 847 A.2d at 706 (internal quotation marks, brackets, and citations omitted). Our Supreme Court has defined undue influence as follows:

The word "influence" does not refer to any and every line of conduct capable of disposing in one's favor a fully and self-directing mind, but to control acquired over another that virtually destroys his free agency. ... In order to constitute undue influence sufficient to void a will, there must be imprisonment of the body or mind, ... fraud, or threats, or misrepresentations, or circumvention, or inordinate flattery or physical or moral coercion, to such a degree as to prejudice the mind of the testator, to destroy his free agency and to operate as a present restraint upon him in the making of a will.

In re Estate of Ziel, 359 A.2d 728, 733 (Pa. 1976) (citations omitted). "Neither old age, nor its infirmities, including untidy habits, partial loss of memory, inability to recognize acquaintances, and incoherent speech, will deprive a person of the right to dispose of his own property." Estate of Smaling, 80 A.3d at 494 (quoting Estate of Hastings, 387 A.2d 865, 868 (Pa. 1978)). Moreover, "[f]or purposes of the undue influence test, a weakened intellect does not rise to the level of testamentary incapacity." In re Estate of Angle, 777 A.2d 114, 113 (Pa. Super. 2001).

Resolution of this case hinged on the orphans' court credibility determinations and its assessment of the testimonial and documentary evidence regarding Decedent's mental resolve. We have reviewed the briefs, the relevant law, the certified record before us on appeal, and the thorough memorandum of the orphans' court filed on March 8, 2017. We

conclude that Sisters' sufficiency argument lacks merit. Although Sisters presented evidence of Decedent's "old age, . . . its infirmities, including untidy habits, partial loss of memory, inability to recognize acquaintances, and incoherent speech," Estate of Smaling, 80 A.3d at 494, they failed to present evidence that, at the time Decedent executed the contested will, Brothers had destroyed Decedent's free agency through "fraud, or threats, or misrepresentations, or circumvention, or inordinate flattery or physical or moral coercion." In re Estate of Ziel, 359 A.2d at 733. Moreover, the orphans' court's well-crafted memorandum adequately disposes of Sisters' sufficiency claim. Accordingly, we affirm on the basis of the orphans' court's March 8, 2017 memorandum and adopt its reasoning as our own.[2]

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date:  12/8/2017

_____

[2] We direct the parties to attach a copy of the March 8, 2017 decision to this memorandum in the event of further proceedings in this matter.

IN RE: ) IN THE COURT OF COMMON PLEAS
) OF SOMERSET COUNTY,
ESTATE OF JEAN B. AUGUSTINE, ) PENNSYLVANIA
DECEASED )
) NO. 126 ESTATE 2015
)
) RULE TO SHOW CAUSE
) NONJURY TRIAL

For Petitioners: Timothy G. Wojton, Esq
Timothy Grant Wojton, Esq.

For Respondents: Brian T. Must, Esq.
Justin M. Tuskan, Esq.

Trial: December 12-14, 2016

### MEMORANDUM

This matter comes before us following a nonjury trial whereat Petitioners sought to have set aside and reversed the Register of Wills' decree which granted letters testamentary to Respondents and admitted to probate the Decedent's March 24, 2011 will. For the following reasons, we deny Petitioners' request.

### I. PROCEDURAL HISTORY

The decedent, Jean B. Augustine ("Mrs. Augustine" or "decedent"), died on March 20, 2015. She and her late husband had five children: Peter C. Augustine, Daniel E. Augustine, Alcinda A. Nensel ("Cindy"), Nancy Palmer, and Sally Lint. On March 27, 2015, the Register of Wills issued a decree granting letters testamentary to Peter C. Augustine and Daniel E. Augustine ("Respondents"), and admitting the decedent's March 24, 2011 will to probate.

On March 24, 2016, Sally, Nancy, and Cindy ("Petitioners") together filed an Appeal From Decree of Probate and Petition for Citation for Rule to Show Cause in Conformity with Som. O.C.R. 10.1.1 as well as a concurrent Petition for Citation Sur Appeal From Probate. Respondents filed an Answer and New Matter on April 15, 2016; Petitioners filed a Reply to New Matter on May 5, 2016. On November 28, 2016, Petitioners filed a Motion for Trial by Jury Pursuant to 20 Pa.C.S.A. § 777, which was denied by Order of Court dated November 30, 2016. A three-day nonjury trial occurred on December 12, 13, and 14, 2016.

## II. FACTUAL HISTORY

In late May, 2009, the decedent's husband died. Trial Tr. 1.153, Dec. 12, 2016. On June 16, 2009, the decedent executed a Durable Power of Attorney, which was prepared by the law firm of Courtney & Courtney, and which appointed the decedent's daughters, Sally and Nancy, as agents. *Id.* at 1.76. On June 17, 2009, the decedent had a will prepared in which she bequeathed all of her property to her five children equally, per stirpes. *Id.* at 1.70; Resp'ts' Ex. 1.

Attorney James B. Courtney[1] began meeting with the decedent on June 30, 2009 in order to advise her on oil and gas transactions. Trial Tr. 1.47-48. On October 15, 2009, the decedent revoked all prior powers of attorney and named her sons Peter and Daniel as her agents. *Id.* at 1.75. On February 24, 2010, the decedent executed another will, again distributing her property equally to all five of her children. Trial Tr. 3.44, Dec. 14, 2016; Resp'ts' Ex. 2.

During the course of Attorney Courtney's representation of the decedent, they

---

[1] Attorney James B. Courtney, Esq. practiced law with his father Attorney James O. Courtney, Jr., Esq. For clarity: all references to "Attorney Courtney" refer to James B. Courtney, Esq., unless otherwise specifically indicated.

2

scheduled an appointment for March 16, 2011 to discuss a "surface agreement for a well site on the Augustine property and a surface agreement for fresh water impoundment on [the same] property." *Id.* at 1.51-52. The decedent had been driven by her sons, the Respondents, to Attorney Courtney's office, and the Respondents accompanied the decedent into the office to review the agreements with her and ask questions. *Id.*

After the parties finished discussing the oil and gas agreements, Mrs. Augustine said to Attorney Courtney, "I want to change my will." *Id.* at 1.53. Attorney Courtney testified, "She told me pretty firmly that she wanted to completely disinherit her daughters, leave everything to her sons and that she wanted that accomplished that day." *Id.* As Attorney Courtney stated,

> I became concerned about what was behind all of this; and, of course, I knew her a little bit by that time from many, many transactions, so...I either asked her or she said, "I'm angry with my daughters." And I think I can say with a pretty high level of certainty that she told me that her daughters—I believe she put it—were treating her as if...she was already dead.

*Id.* at 1.53 (quotations added).

While the decedent expressed a desire to totally disinherit her daughters, the will Attorney Courtney drafted for her ultimately did not do so, though it did substantially reduce the property the daughters were to receive. Attorney Courtney explained as follows how this came about:

> When a client comes in and says something like that...I understand my job as...an attorney...is to write a will that the client tells me to write. But I also believe that part of being an attorney is being a counselor. It's part of the profession. It may not be strictly mechanically writing a will, but it certainly has something to do with looking out for your client and making sure that their best interests are being served[,] or at least their true interests are being served...

3

So several concerns always come up for me when a client does something that's different like that. One is I want to make sure that the client is not acting rashly because of some event that just happened in an emotional sort of way that they might later regret…

I wanted Mrs. Augustine to understand…that this was a serious step and that I have been around for the aftermath of disinheriting children[,] and that it would be a legacy for her[,] and that she needed to…know that; and if she really wanted to do it, she could, but I would ask her just to really consider it[,] because I knew…the family[,] and I knew all of them were her children.

Mostly though[,] what I wanted to make sure was that she understood that she had options. I wanted to present all of her options to her before she made a decision. Complete disinheritance is an option. At the complete other end of the spectrum is equal, exactly equal to everyone. But that's not the end of the story, as I explained to her. There are many things in between those two extreme options that are possibilities.

And I am certain that I explained to her that the land could be divided and that the other assets could be divided and that they could be given as percentages or as specific amounts. I explained options to her….

*Id.* at 1.55-56.

Having received the foregoing counsel from Attorney Courtney, Mrs. Augustine decided that she wanted to bequeath $100,000 to each daughter, and the land north of the center line of U.S. Route 40 would be devised equally to the daughters. *Id.* at 1.56. She gave Attorney Courtney "a very specific list of what she wanted the sons to have and what she wanted the daughters to have; and in answer to my question about anything else that we didn't cover, she wanted the sons to have it." *Id.* at 1.57.

Because the decedent was insistent, Attorney Courtney agreed to draft the will that same day: "I suggested that she go somewhere in Somerset and have lunch, maybe run some errands, if she wanted to, that she could come back and I would have the rather simple will

4

prepared…and that we would execute it, if it was to her satisfaction. But I told her that we would be meeting with her alone at that point, not with her sons. And that's what happened." *Id.* Mrs. Augustine executed the will that day. *See* Resp'ts' Ex. 3.

Attorney Courtney explained that he was "moving as efficiently as [he] could to get down on paper what she wanted that day," and, as such, he "specifically set out the things that the daughters were to receive, but [he] did not specifically set out all of the things that the sons were to receive that had been related to [him] by Mrs. Augustine." Trial Tr. at 1.59-60. Attorney Courtney simply "used the word 'residue'; meaning, sons get everything else." *Id.* at 1.60.

At the time, the decedent asked for the meaning of "residue," and while Attorney Courtney was "certain that we explained it to her," he was still "haunted…a little bit…because she had been so specific" with him about what she wanted to devise. *Id.* at 1.60. Because Attorney Courtney "did not feel that the will [he] wrote reflected the specificity [of the decedent]," and he "didn't like the idea that [he] had been a little bit hurried in writing that will," he called her and told her that while he had explained to her what "residue" means, he would feel better if he could redraft the will so as to reflect the specificity of her instructions. *Id.* The redrafted will is the one that was admitted to probate. *Id. See also* Resp'ts' Ex. 4.

During the execution of the will, Attorney Courtney, his father, James O. Courtney, Jr., Esq., and their legal assistant (who also served as their notary), Donna Felton, questioned Mrs. Augustine, alone, "as always" is the case with will executions, in order to make sure that the decedent was of sound mind and under no constraint or influence. Trial Tr. 1.33, 1.61. As Attorney James B. Courtney elaborated:

5

Well, my father was a big believer in something that I was taught in law school[,] and that was protocol; and as he put it to me, there are certain things that we will do every time, for example, when we have a client execute a will. You will not...remember every will that we do in this office; and...after 30 years, I can tell you that's proven to be quite true. But his point was that if we did them the same every time without exception, whether I remembered them or not, I could be certain that they were done...properly...

[W]hen we would witness wills, that would very typically happen with our whole office involved in executing a will. We are a small office. So my father and I would be the witnesses; my father's assistant...Donna Felton, served as our notary. And my father was very specific that before Donna Felton or I would ever sign as witnesses or...notarize a will, that we would spend some time talking to the client[,] because he had been the one normally preparing the documents; he had been the one spending time with the client. So he would make sure that we spent some time with the client, if we didn't know that person, and satisfy ourselves that the person was 18 years of age, [of] sound mind[,] and under no constraint or influence. He never wanted either of us signing as witnesses or a notary if we were not satisfied that those things were true...

If all of the children were present and everything was equal and no one had a problem, it was not always necessary to isolate, bring the testator in by himself and speak with the testator; but in any other situation, my father always insisted, and I agreed wholeheartedly, that Donna Felton, myself[,] and my father, if we were the three involved, should be speaking to the testator alone and outside [of] the presence of anyone who might be an heir or anyone who might be trying to influence the testator.

Trial Tr. 1.32-34.

As we noted *supra*, the decedent died on March 20, 2015. Her will was admitted to probate on March 27, 2015. Petitioners are contesting the validity of the will based on their allegation that Respondents exercised undue influence on the decedent. We analyze Petitioners' claim, and elucidate the relevant facts surrounding the decedent's March 24, 2011 will, *infra*.

6

## III. ANALYSIS

Once a will has been probated, "the contestant who claims that the will was procured by undue influence has the burden of proof." *In re Estate of Angle*, 777 A.2d 114, 123 (Pa. Super. Ct. 2001). And per the Superior Court,

> A *prima facie* case of undue influence is established and the burden of proof is shifted to the will's proponent when three elements are established: 1) there was a confidential relationship between the proponent and testator; 2) the proponent receives a substantial benefit under the will; 3) the testator had a weakened intellect...For purposes of the undue-influence test, a weakened intellect does not rise to the level of testamentary incapacity.

*Id.* (internal citations omitted).

We observe that testamentary capacity is distinguishable from the "weakened intellect" prong of the undue influence test, *Estate of Lakatosh*, 656 A.2d 1378, 1384 (Pa. Super. Ct. 1995), *see also In re Staico*, 143 A.3d 983 (Pa. Super. Ct. 2016), and Petitioners are not contesting the decedent's testamentary capacity. *See, e.g.,* Trial Tr. 3.199.

A *prima facie* case of undue influence is established when each of the three prongs of the undue influence test are proven by clear and convincing evidence. *Staico*, 143 A.3d at 991. *See also In re Ziel's Estate*, 359 A.2d at 734. The "clear and convincing" standard of proof "imposes on the Court as a legal standard of sufficiency that the evidence as a whole, in quantity and quality, logically enable reasonable minds to find that the contested fact is highly probable (much more probably true than not without excluding reasonable doubt), and impos[es] on the fact finder the obligation to be clearly convinced to the same degree in order to find the contested fact, whether by direct and/or circumstantial evidence." *In re Kolcun*, 42 Som.L.J. 218, 249 (Pa. Com. Pl. Ct. 1983) (Somerset County). Stated otherwise, clear

7

and convincing evidence requires that "witnesses…be found to be credible, that the facts to which they testify are distinctly remembered and the details thereof narrated exactly and in due order, and that their testimony is so clear, direct, weighty, and convincing as to enable the [factfinder] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue.…[It] carries a clear conviction to the mind…or carries a clear conviction of its truth." *In re Fickert's Estate*, 337 A.2d 592, 594 (Pa. 1975) (internal quotations and citation omitted) (emphasis added).

For the reasons discussed immediately *infra*, we find that there is no undue influence here, because while we are satisfied that a confidential relationship existed between Respondents and the decedent, and it was not contested that the Respondents received a substantial benefit under the will, it was not proven by clear and convincing evidence that the decedent had a weakened intellect.

### A. Confidential Relationship

We are satisfied that Petitioners have proven by clear and convincing evidence that Respondents were in a confidential relationship with the decedent.

A confidential relationship exists "whenever the circumstances make it certain the parties do not deal on equal terms, but, on the one side there is an overmastering influence, or, on the other, weakness, dependence, or trust, justifiably reposed[,] for in both situations[,] an unfair advantage is possible." *In re Ziel's Estate*, 359 A.2d at 734 (internal quotations, parentheses, and citation omitted) (emphasis added). While our Supreme Court has stated that "no clearer indication of a confidential relationship could exist than giving another person the power of attorney over one's entire life savings," *id.*, subsequent Pennsylvania Superior Court precedent has clarified that "A parent-child relationship does not establish the

8

existence of a confidential relationship[,] nor does the fact that the proponent has a power of attorney where the decedent wanted the proponent to act as attorney-in-fact." *In re Estate of Angle*, 777 A.2d 114, 123 (Pa. Super. Ct. 2001) (internal citation omitted). Yet these are nevertheless factors to be considered. *In re Estate of Bankovich*, 496 A.2d 1227, 1229 (Pa. Super. Ct. 1985).

Three out of five of the decedent's children lived in close proximity to her. As Sally described it, "My house is between mother's and Danny's house. It's Peter's house and then mother's house and then my house and then Danny's house." Trial Tr. 1.150. Of the remaining two children, Nancy lives in Waynesburg, Pennsylvania, and Cindy lives in Sylvania, Ohio, which is close to Toledo. *Id.* at 1.151. The siblings and parents would get together regularly for holidays, *id.* at 1.152, and the relationship between the parties was generally cordial and fun. *Id.* at 1.153.

Prior to the decedent's husband's death, Sally would perform maintenance around her parents' house, such as patching cracks, priming and painting walls, and putting a new floor down in the kitchen. *Id.* at 1.155. Peter also helped, by, for example, putting new plaster up behind the stove, and fixing drywall. *Id.* at 1.156.

The decedent fell in 2007 and broke her wrist. *Id.* at 1.158. In the summer of 2009, she tripped over clutter in her bedroom and again fell down. *Id.* at 1.157. After the 2009 fall, Sally began providing more assistance to the decedent; Sally cleaned the litter box, washed the decedent's hair and ensured that she was clean, helped the decedent get dressed in the mornings and helped put her to bed every night. *Id.* at 1.156. In the 2009 fall, the decedent had hurt her back such that she needed to wear a back brace, and she required physical rehab. *Id.* at 1.159.

9

41

As discussed *supra*, the decedent, and her five children, read her deceased husband's will in June of 2009. *Id.* at 1.161. At that time, the elder Attorney Courtney suggested to the decedent that she have a Power of Attorney drawn up. *Id.* at 1.162. James O. Courtney, Jr., Esq. asked for volunteers to act as their mother's agents, and Sally, Nancy, and Peter volunteered. *Id.* However, only Nancy and Sally were designated agents. Trial Tr. 2.65.

At this time, the siblings also discussed their mother's will, which would have been the June 17, 2009 will in which the decedent left everything to her children, split equally five ways. Trial Tr. 1.164.

In October of 2009, Sally received a letter from Attorney Courtney informing her that she was no longer needed to serve as an agent for her mother. *Id.* at 1.166. When Sally called her mother to ask why, the decedent responded, "I don't have to answer you." *Id.*

Sally testified that her father had had a "kind of take-charge personality," and her mother would "just defer" to his judgment generally. *Id.* at 1.183. While Dan was nicer to his mother, Peter "pretty much talked to her the same way that daddy did...Not a lot of respect." *Id.* When asked to describe how exactly Peter was disrespectful to the decedent, Sally said, "Um, you know, like if she had an idea about something, it probably wasn't as good an idea [as] he had[,] or there was a better way to do it[,] or...you don't need this or you don't need that...." *Id.* at 1.184. Sally agreed that Peter could be described as bossy and pushy. *Id.* She also described him as a bully. *Id.* at 1.187. She agreed that his personality was just to be a bully, even toward his sisters. *Id.* at 1.188. Sally's sister Nancy also alleged that on one occasion, she heard the decedent remark that Peter had been bullying her to keep the family sawmill open. Trial Tr. 2.125-26, Dec. 13, 2016. But Nancy also added, "I never observed" bullying. *Id.* at 2.178-79. When asked if Peter was good to their mother, Nancy

10

replied, "He'd bring her a sandwich and drink a beer with her while I was there," *id.* at 2.179, which is significant as she had earlier testified that her mother "liked cookies and milk, she liked tea and milk[;] and she liked a little bit of a sandwich and a beer; and that was all she really wanted to eat." *Id.* at 2.113.

Prior to 2007, the decedent was capable of driving herself around, but in 2007 and 2008, her husband drove her everywhere. *Id.* at 2.91. The children who lived nearby became responsible for chauffeuring the decedent around after their father died. *Id.* Because Cindy lived in Ohio, the remaining siblings, plus Dan's wife Lois, split between them the responsibility of driving the decedent around. *Id.* at 2.92.

Dan estimated the distance between his and his mother's house to be an "eighth of a mile maybe." Trial Tr. 3.4. He has lived there "[a]ll of [his] life." *Id.* at 3.5. It was Peter's and Dan's habit to drive their mother around, and the brothers' responsibility for driving their mother around increased after the decedent executed a new Power of Attorney naming them as her agents. *Id.* at 3.26-27. The brothers were the ones to drive their mother to Attorney Courtney's office in 2011, without their sisters' knowledge, so that decedent could change her will. *Id.* at 3.27-28.

As discussed *supra*, Attorney Courtney met multiple times with the decedent to discuss oil and gas transactions prior to the time when the decedent asked him to draft her a new will. Respondents accompanied the decedent during these meetings; as Attorney Courtney stated, "Well, I was aware that Peter and Daniel Augustine had…what I considered to be a very wide-reaching comprehensive Durable Power of Attorney. And I knew that they could sign on her behalf and they did participate in many of the meetings where we discussed the negotiation that was pending and the documents that I was proposing." Trial Tr. 1.42.

11

However, Attorney Courtney in this case did not have Respondents execute these documents:

> [I]t was always my policy, particularly in the oil and gas business, but generally speaking, that...if the principal could sign, if they did understand the document and there was no reason that they wouldn't be signing, I was never very comfortable having the agents or the attorneys-in-fact sign in place of the principal.
>
> I always wanted to know firsthand if the principal understood what was being signed and that the principal had had a chance to tell me whether or not they agreed or disagreed with what we were doing. I didn't want any agents acting against the will of the principal. So easiest way to make sure that this did not happen was to have the principal sign and meet with the principal herself, if that was possible.

*Id.* at 1.42-43.

While further details of the decedent's mental acuity are of course relevant as to whether she was susceptible to undue influence, we believe that further discussion is best saved for our analysis of the "weakened intellect" prong of the test; therefore, we return to this subject *infra*. We believe it is sufficient to note, for now, that Attorney Courtney testified that the sons were "active participants" in the discussion, and they seemed to be "quite helpful to [the decedent] often in pressing issues about the property and making us aware of certain features and characteristics of the property...." *Id.* at 1.46. Respondents "did participate...I think they were helpful and at times had great, great comments or perceptions, but I was more worried about whether Mrs. Augustine as the principal was satisfied. It was not my job to satisfy the sons." *Id.* at 1.47. In other words, while Respondents were present and engaged in the discussions, it was the decedent who made the final determinations as to whether to move forward, not the sons.

Peter was under the impression that the decedent had named him and his brother to be her agents because she placed trust and confidence in them and that she believed they had her

12

41

best interests in mind. Trial Tr. 3.117.

Respondents also accompanied their mother to Huntington Bank in Morgantown, West Virginia so that she could reinvest her money into investments with a higher rate of return. *Id.* at 3.132. However, Peter testified that though he and Dan drove their mother to the bank and sat in on the consultation the decedent had with the banker, Respondents did not participate in the decision-making. *Id.* at 3.153. The decedent also had a safe in her home, the combination to which she disclosed to Peter. *Id.* at 3.124-25.

Dan's late wife Lois retrieved the decedent's mail-ordered prescriptions. *Id.* at 3.23-24. Respondents also assisted the decedent with paying bills and other tasks around the house. *Id.* at 3.143. Peter actually filled in the information in some of his mother's checks, such as the payee's name, which she then signed. *Id.* at 3.163. Later, after his mother's admission to the assisted living community Henry Clay Villa, Peter began signing the checks personally. *Id.* at 3.165. There was also credible testimony that Respondents attempted to discourage contact between the decedent and Petitioners. *See, e.g.,* Trial Tr. 1.190-95; 2.7-12. Daniel in fact supervised visits between Nancy and their mother. Trial Tr. 2.109-10.

The evidence supports a finding that there was "weakness, dependence, or trust, justifiably reposed" on the part of the decedent. *In re Ziel's Estate*, 359 A.2d at 734. Our determination is guided by *In re Mampe*, 932 A.2d 954, 963 (Pa. Super. Ct. 2007), in which the Superior Court found a confidential relationship where: a testatrix had appointed her daughter as her attorney-in-fact; the daughter had seen the testatrix "every day and helped her with her medications, purchased necessary items, wrote checks on her behalf, and performed many activities with her"; the testatrix checked with her daughter when she wanted to do something, and the daughter told her what to do.

13

Here, Respondents, the decedent's sons, were appointed as the decedent's attorneys-in-fact; Respondents lived in close proximity to the decedent and helped her with everyday matters around the house, including assisting her in obtaining her medication; Respondents drove the decedent around; Respondents sat in on and vigorously participated in negotiation talks and consultations about the decedent's oil and gas interests; Respondents also drove the decedent to, and attended, a meeting regarding the decedent's investments; Respondents addressed, and later fully wrote, checks for the decedent; Respondents also discouraged contact between the decedent and her daughters.

This is not to say that Respondents exercised an "overmastering influence" on the decedent. There is credible testimony that while Respondents were active participants in the decedent's affairs, the decedent made the ultimate determinations as to whether the oil and gas documents were to be signed and what changes to make to her investments. And, while there is also credible testimony that Respondents attempted to hinder the decedent from having contact with her daughters, the decedent was clearly willful enough to assert her preferences, as one of Nancy's accounts illustrates:

> In June 2009, my mom was [at the Henry Clay Villa]…I went to the nurses' station, and they says, "We have to call Danny." The lady gets on the phone, she calls Danny, and hangs up and says, "Danny says she can't go." And I said to the lady, "I have spoken with the Area Agency on Aging, and they said only my mother can say she does not want to go." And they sort of says, "I better call Danny back." So they called Danny back, and he asked to speak with my mother. I couldn't hear it but they said that out loud, and gave her the phone, and she says, "I still want to go." And so I took her.

Trial Tr. 2.149. Nancy testified to a similar occurrence on Easter of 2012: Nancy had stopped by Henry Clay Villa to visit the decedent, but the decedent had been signed out. *Id.* at 2.154. Nancy found her mother at her mother's hunting cabin, and visited with her there.

14

*Id.* As Nancy testified, afterwards,

> I went down to Sally's for a visit; and we had a general discussion when I was with my mother that Cindy was coming in and we would all eat supper together.
>
> So at a later time in the day, Cindy and I left Sally's. We went up to my mother's house and [and were told that the decedent was not there]...[W]e went up to Peter's to visit our mother, and we got there[,] and my mother's there in a chair. Peter's there, Danny's there, and there may have been other people there; but those people were there.
>
> And I said, "Mom, we're ready to take you down to visit with Cindy's family and everybody at Sally's," and Peter says, "Remember, Mom, you don't want to go."
>
> And he repeated it a second time, a few minutes later, the exact same thing. But I said to my mom, I says, "Cindy's family come from a long ways away." I said, "Her one daughter came from clear from New York to see you. She hasn't seen you for a long time and she has a new husband, and you want to visit?" She says, "Of course I want to go visit."
>
> I says, "Come on, Mom. We're taking you." And we put her in my car and we went down to Sally's and had a very nice visit with her, and we returned her to Peter's[,] and Danny was still there.

Trial Tr. 2.154-56. With such evidence as this, we find that the decedent retained her ability to assert her will and exercise her preferences against her sons' sometimes emphatic suggestions.

So, while we hesitate to conclude that Respondents exercised an "overmastering influence" over their mother, we have no difficulty concluding that there existed "weakness, dependence, or trust, justifiably reposed" such that "an unfair advantage is possible." *In re Mampe*, 932 A.2d at 963. Respondents clearly acted as advisors, counselors and confidants, and inspired confidence in their mother that they would act in good faith for her interests. *Estate of Lakatosh*, 656 A.2d 1378, 1383 (Pa. Super. Ct. 1995). Based on the evidence

15

41

discussed *supra*, we find that Petitioners have proven by clear and convincing evidence that Respondents were in a confidential relationship with the decedent.

### B. Substantial Benefit

Respondents do not contest that they received a substantial benefit under the will. *See* Resp'ts' Trial Mem. 4 n.1, Dec. 8, 2016 ("Respondents do not contest the fact that they received the majority portion of the Decedent's estate under the Will."); Trial Tr. 1.26 (Resp'ts' counsel arguing only that prongs one and three of the undue burden test are unsatisfied).

In any event, the evidence amply supports, by clear and convincing evidence, that Respondents received a substantial benefit under the will. *See, e.g.,* Trial Tr. 3.102-03 (Dan's testimony that he and Peter received substantially more than their sisters); Trial Tr. 1.96 (Attorney Courtney's testimony that Respondents received more under the will than Petitioners); Pet'rs' Ex. B (inheritance tax return indicating that the decedent's estate was worth over one million dollars after taxes and funeral/administrative expenses, the bulk of which went to Respondents).

### C. Weakened Intellect

Weakened intellect, or the "weakened mental condition" which must be shown need not "rise to the level of testamentary incapacity." *In re Ziel's Estate*, 359 A.2d at 734. Testamentary capacity, which is "a quality every person *sui juris* is presumed to possess, is whether a man or woman has an intelligent knowledge regarding the natural objects of his bounty, the general composition of his estate, and what he desires done with it, even though his memory may have been impaired by age or disease." *In re Estate of Angle*, 777 A.2d at

16



125. So, testamentary capacity, which concerns the particular mental condition of the testatrix on the day she executes her will, is distinguishable from the "gradual, progressive inculpation of a receptive mind" which occurs as a result of undue influence. *Lakatosh*, 656 A.2d at 1384. Existence of a disease such as Alzheimer's does not "in itself…establish incompetency to execute a legal instrument," as there are "periods of lucidity with the disease, [such that] the relevant inquiry is whether at the time of the execution of the document, the decedent was lucid and competent." *Angle*, 777 A.2d at 123.

The facts immediately surrounding the execution of this will were discussed *supra* in section II; however, we will revisit them in more depth *infra*.

Petitioners allege that the decedent suffered from a weakened intellect at the time she executed her March 24, 2011 will, which manifested itself in a lack of self-confidence in performing routine tasks, forgetfulness, and confusion.

As discussed above, Sally testified that, after her mother fell in 2009, Sally began helping out more around the house; for example, she would clean the house, bathe her mother, and clean out the litter box. After her husband's death, the decedent became "a little lackluster about everything. I don't think she cared about a whole lot after daddy died…she had never been without him before." Trial Tr. 1.160. Sally also described her mother's sometimes inability to keep her medication straight:

> Well, she would call me first thing in the morning and ask me if she had taken her pills. Well, I hadn't been there yet, so I didn't know. So we tried to get her a pill box that had the days of the week and stuff like that; and with the amount of pills that she was on, there was like a countertop full of pills. And she would have like maybe missed one pill out of this day and miss one out of this day and—I mean even with a pill thing, she, she couldn't keep them straight. I wanted to put the pills someplace else so she only saw the pill box and like that month's pill bottles.

17

*Id.* at 1.168. *See also* Trial Tr. 2.101-102. Sally further testified that her mother's "memory was going" generally, *id.* at 1.172, which manifested itself in other ways such as an inability to recognize neighbors at a party. *Id.* at 1.173-74. Sally's father, toward the end of his life, began asking Sally to perform business tasks for him that the decedent had previously performed, such as making business phone calls, filling out "his sales tax...and...the auditor's papers..." *Id.* at 1.177. The decedent displayed an increasing inability to cook, *id.* at 1.179, and confusion sometimes regarding which mail was outgoing versus incoming. *Id.* at 1.180-81.

As mentioned *supra*, the decedent was driven around by her children, and Respondents eventually began filling out her checks for her. Sally, however, testified, "[S]he could do it [i.e., write checks]...it just took her a long time. You had to explain a couple times who it was to and what it was for and how much it was and it took her a really long time for her to fill that out." *Id.* at 1.186. It is Sally's opinion that her mother suffered from dementia. Trial Tr. 2.38.

Nancy likewise testified that her mother did not fully understand her own investments, and she was negligent in some ways about food storage. *Id.* at 2.105-07; 2.113. Nancy also described some mild paranoia on her mother's part regarding people taking her property. *Id.* at 2.124. Nancy also observed confusion on her mother's part about her bills. *Id.* at 2.137. However, there is substantial, and credible, countervailing evidence which prevents Petitioners' evidence from satisfying the required clear and convincing standard, specifically the testimony of the decedent's treating physician Dr. Barbara Wilhelm and her attorney, James B. Courtney, Esquire.

Dr. Wilhelm graduated from the University of Pittsburgh and was licensed to practice

18

medicine in Pennsylvania in 1980. Trial Tr. 3.179, Resp'ts' Ex. 20 (Barbara Wilhelm, M.D. Dep. 7, Oct. 5, 2016). She treated the decedent, starting in 2009. Wilhelm Dep. 8. The decedent was at that time not seeking treatment for any particular malady; "[s]he basically just came to establish [herself] as a new patient." *Id.* Dr. Wilhelm continued to see the decedent up until the latter left Henry Clay Villa. *Id.* at 9. While the decedent was residing at Henry Clay, Dr. Wilhelm saw her at "least every month." *Id.* However, "[b]efore that, when she was in the office, between 2009 and 2011, it was much more sporadic. It was when she felt she needed to come in." *Id.* Each visit lasted about twenty minutes. *Id.*

Dr. Wilhelm treated the decedent for "low thyroid…high blood pressure…high cholesterol…osteoporosis…some fractures." *Id.* at 9-10. Dr. Wilhelm also noted that "[s]he had some mild memory complaints, and we did prescribe for that" around October 2009. *Id.* at 10.

Dr. Wilhelm would describe the decedents "memory issues" as "mild cognitive deficit," which means

> that a person has some difficulty with memory. They may forget where they put something or be more fuzzy on dates or specifics, but they are still very much able to manage basic activities of daily living, such as feeding themselves, taking care of themselves. A lot times, they can still manage a lot of things.
>
> They may need some help knowing today is the day to pay a bill, but, generally, their judgement is still intact.

*Id.* at 10-11. According to Dr. Wilhelm, the decedent was prescribed Aricept, which "apparently improved her condition." *Id.* at 11. However, the decedent's condition did not worsen "during the time that she was in the office," that is, between 2009 up to the end of March 2011. *Id.* at 11.

19

Dr. Wilhelm never diagnosed the decedent as having dementia, Alzheimer's or cerebral degeneration. *Id.* at 13. But, while Dr. Wilhelm got a "rough idea of [the decedent's] mental status" by conversing with her and asking her, e.g., what day of the week it was, Dr. Wilhelm never performed a mental exam on the decedent. *Id.* Still, while Dr. Wilhelm observed some "mild memory problems," she did not observe any "confusion or disorientation" in the decedent. *Id.* at 14.

As discussed *supra*, Attorney James B. Courtney began advising the decedent as to oil and gas transactions on June 30, 2009, and Attorney Courtney was the scrivener of the will at issue, drafted in March, 2011. We described *supra* the protocol and internal procedures Attorney Courtney's office had in place at the time to detect for testamentary capacity and undue influence. What we presently expand on is Attorney Courtney's personal experience with the decedent prior to her execution of the will at issue.

When a testatrix is alleged to have suffered from a weakened intellect; and the scrivener of the will provides testimony as to the testatrix's mental state; yet the scrivener had had no contact with the testatrix prior to drafting the contested will; then the scrivener's testimony as to the testatrix's mental state is "not dispositive of the question of [the testatrix's] weakened intellect." *Mampe*, 932 A.2d at 961. In fact, it can be said that the scrivener's impressions of a testatrix in such circumstances are of "limited value in probing the weakness of...intellect in the time period prior to the making of the...will and trust." *Id.* at 962. In order to properly weigh Attorney Courtney's testimony regarding the decedent's intellect, then, it is crucial that we explore in more depth his history with her.

Though Attorney Courtney's father had done work for the Augustines in the past, and Attorney Courtney would observe them in and around the office, he agreed that his "real time

20

to get to know [the decedent] would have been more in the oil and gas era than when they were passing through the office and [his] father would do business for them": "Yes, from the time that I started to do oil and gas negotiations related to the Augustine property…I was the primary person in our office responsible for Mrs. Augustine." Trial Tr. 1.35-36. When asked how he remembers the decedent, Attorney Courtney stated, "Well, she was smart…Maybe deceptively so…because…I mean this in no disparaging way[,] but she was a typical Somerset County woman from the mountains. She knew how to fend for herself and she was very independent with the way that she lived and a very independent thinker as well." *Id.* at 1.36.

Over the course of his representation of Mrs. Augustine, Attorney Courtney met with her approximately thirteen times, with a fourteenth event in Courtney's calendar being Mrs. Augustine's funeral. Trial Tr. 1.47. *See also* Resp'ts' Exs. 5-18. The first two appointments were at the Augustine residence, where Attorney Courtney met with the decedent, her sons, and representatives of an oil and gas company; otherwise, "every document that was signed and every meeting took place…at my office." *Id.* at 1.48.

When asked if he noticed any significant changes in the decedent's demeanor, Attorney Courtney replied, "Well, there's no doubt she was getting older and there's no doubt that her energy level was not what it was when I first met her. As far as her independent thinking and her ability to…have a sense of humor [and] to perceive what I was telling her and to…either accept or not accept what I was trying to do for her, she retained all those things for the time period that I was with her." Trial Tr. 1.50-51.

As we observed *supra*, at the time of the execution of the first of two wills, both of which substantially reduced Petitioners' inheritance, the decedent remarked to Attorney

21

Courtney that she was angry with her daughters because they were treating her as if she were already dead. Trial Tr. 1.53. She also gave an additional reason, as the following exchange illustrates:

> Q: Did Mrs. Augustine ever tell you any concern that she would have in leaving the property to all five children?
>
> A: Over the course of talking about her property for all of those meetings that I had with her, the specific focus on how she felt about the property, how she loved the property, and a lot of that came up in the context of protecting the property from oil and gas, she did tell me that she had a great concern that if she left this property to five people, it would be nothing but a fight and it would end up in selling the family property that she loved.
>
> Q: Did she ever describe to you whether it was important to her that the property stay in the family?
>
> A: Well, that was of utmost importance to her.

*Id.* at 1.62. There is no record of how many hours Attorney Courtney spent with the decedent, as his billing method was what he described as a "task-oriented fee" as opposed to an hourly one. *Id.* at 1.83.

There is evidence here that the relationship between at least some of the petitioners and decedent had become distant and embittered, which is corroborative of the explanation decedent gave Attorney Courtney, that is, she was inclined to reduce her daughters' inheritance because they were treating her as if she were already deceased.

As mentioned *supra*, Mrs. Augustine named her daughters Sally and Nancy as her agents in June, 2009; however, in October, 2009, Mrs. Augustine revoked these powers of attorney and assigned them to Respondents. Sally testified that she had gotten along well with her mother, for the most part, between June and October, so it was a surprise to her that her mother would change the powers of attorney. Trial Tr. 1.166-69. Sally did not respond

22

well when she learned that her powers of attorney had been revoked, as her testimony illustrates:

> Q: Now...when you learned this, were you a little bit offended, a little bit...saddened by that?
>
> A: I was crushed. I mean[,] we were working our butts off. We couldn't figure out why she would do that.
>
> Q: Nevertheless, despite you feeling crushed and not knowing why she did that, did you nevertheless continue to maintain a cordial, friendly and loving relationship with your mother?
>
> A: Eventually. I was—like I said, I was a little miffed. We didn't speak for a couple months maybe. [...]
>
> Q: So this started like in October of 2009...So would you say by the new year, 2010...the silence had gone away and you were talking again with your mother?
>
> A: We were talking on the phone. I wasn't going up there every day or anything, but we would talk on the phone.

Trial Tr. 1.169-70. Sally opined that her mother seemed guarded after this time, but she admitted that she never asked her mother why things had changed, explaining, "No, [she never asked why her mother acted that way,] because people with her condition, you try to keep things on an even keel. You know, you don't ask questions that you know are going to upset them." *Id.* at 1.171.

Sally acknowledged that the decedent believed her daughters were trying to sell the farm, and "after October, when she, you know, thought we were trying to sell the farm...we were not going to be able to change her mind, but nobody else tried to straighten her out about it either, you know, to get her straight. There was never any discussion. Nobody ever asked us about what we wanted to do or what we cared about or anything. Nobody ever asked." Trial Tr. 2.50.

23

According to Nancy, the decedent approached her about selling some equipment on the property. *Id.* at 2.71. However, Nancy later testified that it was her (Nancy's) idea to have the property appraised for auction:

> Q: And there came a time in the summer of 2009, where things kind of came to a head between you and your mother as it relates to selling these items that the auction house was going to sell for her. Is that correct?
>
> A: Actually that was in October. And she had, she had okayed...him coming. A magazine had come[,] [which] my father had subscribed to[,] called Kittrell Auctions, and their primary specialty is doing auctions to sell logging equipment.
>
> And I showed her that and I says, "Mom, you keep telling me you want rid of these trucks, and you want rid of that lumber back there. This is what these people do. Can I contact them[?]" And she said yes.

Trial Tr. 2.159-60.

Nancy subsequently invited an appraiser to visit the property to ascertain the value of this equipment, which ultimately ended up being between $30,000 and $35,000. *Id.* at 2.74. While both of the brothers were aware that this appraisal was going to occur, there is no indication that either participated in it. *Id.* at 2.74-75. This appraisal seems to have had a souring effect on the decedent; as Nancy's testimony evinces:

> Q: What was the nature of the discussion; what was it about? I'm not asking you to quote third parties.
>
> A: I understand. He [the appraiser] just wanted to tell my mom how much the equipment was worth, and that he told her that he didn't recommend that their company would handle any auction for her, because he thought they would have to take too much of a profit margin because of the way they did it. He recommended to her, if she really wanted to sell it by auction, she should get a local auctioneer.
>
> [...]

24

Q: Do you recall whether your mother and you discussed this matter after the gentleman came and talked about your options, with regard to the equipment?

A: No. She acted strange the day this man came.

Q: What do you mean by that?

A: She would not talk. I said, "Mom, this is the man...you said you wanted someone to look at the equipment. This is the man." And it was like a complete change in her demeanor.

So the gentleman and I went out and looked at the equipment.

Q: Now, if the equipment was never sold and no auction was ever scheduled, did you have occasion to speak to your mother ever again about this matter we've been discussing for the last ten minutes?

A: No, I did not. I spoke to Danny about it, though.

Q: And what was the nature of the conversation with Dan?

A: I got the paper that said I've been removed as power of Attorney, and I called my mom to ask her about it. And when my mom had nothing to say about that on the phone, Danny got on the phone and asked me, says, "When's this auction?"

Trial Tr. 2.77-78. Dan corroborated that his mother "was upset when she thought her equipment was [going] to be auctioned off." Trial Tr. 3.45. However, he had earlier testified via deposition that his mother did not appear to be upset about the auction, rather, "[s]he just wasn't having any part of it." *Id.* at 3.46. While there is some tension between Dan's deposition testimony and his trial testimony, we find that his trial testimony nevertheless is in line with his sister's testimony that their mother was unhappy about the appraisal and proposed-auction. Peter testified that his understanding was that their mother changed her Power of attorney because Petitioners "were doing things that she [the decedent] didn't want done...I believe they were selling things that she cared about and usually not at full value."

25

*Id.* at 3.109.

Around the time the decedent withdrew the Power of Attorney naming her daughters as agents, the decedent mailed to Nancy a check for $500, along with a positive handwritten letter, apparently as payment for Nancy's services over the past four months. *Id.* at 2.87. *See also* Pet'rs' Ex. I. Around Christmas of 2009, after the decedent had changed her Power of Attorney, Nancy observed that she "was friendly toward me, but she did not talk as much as she did whenever I had been there a lot: It was a little bit more subdued." *Id.* at 2.127.

Nancy's contact with the decedent decreased over 2010, relative to the four or five months leading up to the change in Power of Attorney, but when Nancy did see her mother, "She was just saying hi, how are you, and I was basically saying the same thing back to her. We did not have long, involved conversations, you know. It was just pleasantries." *Id.* at 2.130; *see also id.* at 2.127-31. As we noted *supra*, Sally's contact with the decedent also tapered off around that October because of Sally's disappointment with having had her agency revoked. While Cindy was not involved at all in the appraisal, *id.* at 2.211, she likewise had (pre-existing) marginal contact with her mother, visiting her "probably about twice a year" and talking to her on the phone "[e]very couple [of] weeks or so." *Id.* at 2.208-09. When asked if her relationship with the decedent was "close" and/or "friendly," Cindy replied, "I would say it was friendly, yes." *Id.* at 2.212-13. While Cindy had what she described as a "cordial" relationship with her brothers, she began to feel isolated from the family and her mother in 2011. *Id.* at 2.215. Cindy had otherwise made few observations of her brothers' interactions with their mother, their mother's finances, their mother's hospitalization, or the prior discord regarding the property appraisal. *Id.* at 2.211, 2.219-20.

We are convinced that this case is indistinguishable, in many respects, from *In re*

26

*Estate of Angle*, where the testator in that case actually suffered from Alzheimer's disease, yet he "remained adamant about his wishes in all respects," and exercised his will in various matters despite opposition from his children and attorney. 777 A.2d at 124. Here, the decedent exercised her will against Respondents on multiple occasions when Respondents attempted to interfere with Petitioners' visits with the decedent; and, crucially, it is the decedent's displeasure with the appraisal initiated by Nancy which put a stop to the potential auctioning off of equipment on the property, and which precipitated the decedent revoking Petitioners' agency under the Power of Attorney, after which Sally and Nancy both had decreased contact with the decedent (and Cindy had as little contact as she had historically had). Moreover, here, as in *Angle*, there were credible disinterested witnesses (i.e., Dr. Wilhelm and Attorney Courtney) establishing that the decedent was "competent and not suffering from a weakened intellect at the relevant time." *Id*. at 123.

We are mindful that in order for the "clear and convincing" standard to be met, evidence must be "so clear, direct, weighty, and convincing as to enable the [factfinder] to come to a **clear conviction, without hesitancy,** of the truth of the precise facts in issue...." *In re Fickert's Estate*, 337 A.2d at 594 (emphasis added). That said, because: the decedent remained intentional around the time she executed the contested will; she was aware of her assets as well as how she wanted them distributed, while still being responsive to advice from her attorney; the uncontested facts are that Nancy had organized an appraisal of some of the decedent's property which irritated the decedent and precipitated the decedent's revocation of her daughters' (Nancy's and Sally's) authority under the Power of Attorney, which revocation itself precipitated a lesser amount of contact between the decedent and Petitioners (admittedly, in Sally's case, because she was upset about being removed as an agent); and

27

because both Dr. Wilhelm and Attorney Courtney each had years to become acquainted with the decedent prior to the execution of the contested will, and each witness testified that neither noticed any substantial change in the decedent's intellect between 2009 up to March, 2011, and both of these witnesses are disinterested in the sense that neither of them would be affected regardless of how this case ultimately resolves; we find that the aforementioned factors weigh heavily enough against Petitioners' testimony, such that Petitioners have failed to instill in the Court a "clear conviction, without hesitancy"—that is, to prove by clear and convincing evidence—that the decedent had a weakened intellect around the time she executed this will.

So, while Petitioners have proven by clear and convincing evidence that Respondents were in a confidential relationship with decedent, and it was not contested that Respondents received a substantial benefit under the will, it is nevertheless the case that Petitioners have failed to prove by clear and convincing evidence that the decedent suffered from a weakened intellect around the time when she executed the contested will.[2] For this reason, Petitioners'

---

[2] We are aware that Petitioners' have also attempted to demonstrate undue influence, or at least bolster their undue influence claim, through use of more circumstantial evidence, such as the fact that Respondents received substantial non-probate assets from the decedent, *see, e.g.,* Trial Tr. 3.92, 3.95, 3.99; Resp'ts' Exs. 22-24, as well as the fact that the decedent's Maryland death certificate states that she died of dementia, the implication being that if the decedent died from dementia, she was likely to have suffered from it in 2011, and Respondents had exploited her dementia, which is how they convinced her to make them beneficiaries of her investments.

We ruled that the death certificate was inadmissible for the purpose of establishing that the decedent's death was related to dementia which had been in onset for years. Trial Tr. 2.81, 2.122; Pet'rs' Ex. H. However, even considering it *arguendo,* we question its relevance: the declarant, P. Daniel Miller, D.O., was not present to testify in court, so the basis for his conclusion that dementia caused decedent's death was not established; moreover, even if the decedent died from complications resulting from dementia, her death occurred approximately four years after her execution of the will, and while her ostensible dementia may have developed years before her death, there is no evidence from which we could conclude that she necessarily or even probably suffered from dementia in March, 2011. Petitioners attempted to introduce evidence of hospital records from May, 2011, which stated that the decedent was "unable to problem solve," needed several "verbal cues" in order to successfully take a shower, etc. *See* Trial Tr. 3.82-88; Pet'rs' Ex. L. We did not admit this evidence insofar as it would be used to establish the facts of the matter asserted, but permitted them to be introduced in order for counsel to ascertain whether Petitioners had ever received any of this information. However, again, assuming *arguendo* that any of the underlying observations contained in the exhibits were considered, they are from two months after execution of the will and directly conflict with the observations of

28

request to set aside the decedent's March 24, 2011 will must be denied.

## IV. CONCLUSION

Petitioner's challenge the decedent's March 24, 2011 will based not on a lack of testamentary capacity, but rather on the existence of undue influence, allegedly exercised on the decedent by Respondents.

When a will is admitted to probate, the contestants who allege that the will was the fruit of undue influence have the burden of proof, and a *prima facie* case of undue influence is shown where it is established that (1) there was a confidential relationship between the will's proponents and the testatrix; (2) the proponents receive a substantial benefit under the will; and (3) the testatrix had a weakened intellect.

Here, we found that there was a confidential relationship between Respondents and the testatrix, and the fact that Respondents received a substantial benefit under the will has not been contested; however, Petitioners have failed to prove by clear and convincing evidence that the testatrix had a weakened intellect. For this reason, Petitioners have not made out a *prima facie* case of undue influence; therefore, the burden of proof does not shift back to the will's proponents to refute the charge of undue influence, and the will must consequently be upheld.

---

Dr. Wilhelm and Attorney Courtney; as Dr. Wilhelm and Attorney Courtney were subject to cross examination (with the latter actually testifying at trial, and the former testifying only by deposition), we would find their opinions more credible, in any event.

Regarding the petitioners being the decedent's beneficiaries: the fact that Respondents received substantial non-probate assets is consistent with the decedent feeling aloof from her daughters and that her daughters were treating her as if she were "already dead."

29

MAR 0 8 2017

IN RE: ) IN THE COURT OF COMMON PLEAS
) OF SOMERSET COUNTY,
) PENNSYLVANIA
ESTATE OF JEAN B. AUGUSTINE, )
DECEASED ) NO. 126 ESTATE 2015
)
) RULE TO SHOW CAUSE
) NONJURY TRIAL
)

## ORDER

AND NOW, this 6th day of March, 2017, the Court having conducted a nonjury trial on Petitioners' Appeal From Decree of Probate and Petition for Citation for Rule to Show Cause.... as well as their concurrently-filed Petition for Citation Sur Appeal From Probate, and upon review of the evidence and arguments of record, and for the reasons discussed in the accompanying memorandum of law, it is HEREBY ORDERED, ADJUDGED and DECREED that the aforementioned Appeal and petitions are DENIED.

BY THE COURT:

_____
Scott P. Bittner, J.

| COPIES DISTRIBUTION | BY: umS | |
|---|---|---|
| TO | HOW | DATE |
| Atty Timothy G. Wojton | Mail | 3.8.17 |
| Atty T.G. Wojton | mail | 3.8.17 |
| Atty Brian T. Must | mail | 3.8.17 |
| Atty Austin M. Tuskan | mail | 3.8.17 |
| | | |

(41)